## LAWSON B. WILSON vs. MARY R. WILSON.

*Husband and Wife—Enforcement of Trust Upon Which Property is Conveyed by Husband to Wife—Deeds—Consideration.*

When property was conveyed to a wife by her husband upon the faith of her promise to allow him to collect the rents during his life, she will not be allowed in equity to repudiate the agreement as void and still hold the property.

Plaintiff filed a bill against his wife alleging that upon her promise to lend him a certain sum of money he executed an absolute deed to her of certain real estate belonging to him; that she subsequently refused to make the loan and the deed was consequently not recorded, but kept in plaintiff's possession; that a year afterwards he agreed to record the deed in consideration of his being allowed to collect the rents of the property during his life; that the defendant signed an agreement leasing the property to him for life for a nominal consideration and on the same day the deed was recorded; that subsequently the parties separated and the defendant refused to allow plaintiff to collect the rents. The bill prayed for a decree establishing the trust upon which the defendant held the property and the right of the plaintiff to receive the rents. Defendant denied many of the allegations of the bill and claimed that the agreement signed by her relating to rents was obtained by duress. *Held*, that the allegations of the bill were sustained by the evidence and that the plaintiff was entitled to the relief asked for.

Appeal from a decree of the Circuit Court for Allegany County (BOYD, J.), dismissing the bill of complaint after testimony was taken. The opinion of the Court below upon the demurrer to the bill was as follows after stating the allegations :

" The main question to be determined is whether a married woman can admit in a Court of Equity that such facts as the above exist, and yet hold property thus acquired without being compelled to carry out her part of the agreement. I take it that if there was such a controversy between two persons who were *sui juris* and not related as parent or child, husband or wife, or in some way from which the presumption would be that it was intended as a

gift or advancement, there could be no question about the authority of this Court to grant relief. Let us therefore see whether the fact that it is a proceeding of a husband against his wife can make any difference.

"Although I do not recall any case in Maryland in which it has been held that a husband can sue his wife, except in divorce cases, the weight of authority seems to be that either can sue the other in equity for protection of his or her property. "In equity contracts made directly between husband and wife, if *bona fide* and on a good consideration, may be enforced by the wife against her husband, or by the husband against his wife." *Corr's Appeals*, 62 Conn. 409. See also 9 *Am. & Eng. Ency.* 794–798 ; vol. 2 *Story's Eq. Juris.* sec. 1372 ; *Phelps Juridical Eq.* sec. 36 ; *Stewart & Cary Husband and Wife*, Art. 48–49 and 62 ; *Barton* v. *Barton*, 32 Md. 214. Other cases might be cited, but I deem it unnecessary on that point. There are, of course, many cases in which neither a Court of Equity nor a Court of Law can grant relief against a married woman, but I do not think a Court of Equity is so helpless as not to be able to do so under such circumstances as those stated in the bill. If the defendant had procured the deed in her own name from a third person and had used the plaintiff's money in paying for the property which was not intended to be as a gift to her, but to be held by her for her husband, the plaintiff would have a remedy on the ground of a resulting trust. *Bishop on Husband and Wife*, secs. 115–118 and 124 ; *Keller* v. *Keller*, 45 Md. 269. If the transaction had been an absolute purchase by the wife from the husband, but the purchase money had not been paid, the latter could have enforced his vendor's lien, and I can see no valid reason why a Court of Equity cannot compel her to comply with the terms of the agreement by which she procured this deed, according to the allegations of the bill. It is true she could not be sued on the contract itself, either by her husband or a third party, for a breach thereof, but that is not what is attempted here. This Court is in substance asked to say to her that she cannot

retain the property conveyed to her for a particular purpose during the lifetime of the grantor, unless she carries out that purpose—or to speak more properly, that trust. "A gift or grant of property to a grantee or donee to be applied to a certain use or purpose fastens a trust on the holding of the legal estate." *Mory, Executrix,* v. *Michael,* 18 Md. 241. As was said in *Crampton* v. *Prince,* 83 Ala. 246 (3 Am. St. Rep. 718), in reference to a vendor's lien: "It is as unconscionable for a married woman to get the land of another and keep it without paying the purchase money, as for one *sui juris* to do the same." The same principle is applicable in this case—it would be as inequitable to permit a married woman to get property for nothing with the understanding that the grantor should enjoy it for life, and then refuse to carry that out, as it would be for one who is *sui juris.* As between husband and wife, a Court of Equity would not enforce a hard bargain against her, but it ought not hesitate to compel her to carry out a trust of this nature. The agreement signed by the defendant is in the nature of a declaration of trust when taken in connection with the deed, which was, as alleged in the bill, delivered on the date of the execution of the agreement, and in consideration thereof. I have not found any precisely similar case to this, but that of *Grain* v. *Shipman, Assignee,* 45 Conn. 572, is not remote in principle from the one before me. There the deed was made to Mrs. Grain, who paid the nine thousand dollars of the purchare money, and for the balance (fifteen thousand dollars) the joint note of Mr. and Mrs. Grain was given, secured by a mortgage executed to them by the vendor. Mrs. Grain spent twenty-two hundred dollars in improvement, of which her husband repaid her twelve hundred dollars. Mr. Grain paid with his own funds the fifteen thousand dollar note. Subsequently Mrs. Grain executed and delivered to her husband a deed for the property, and on the same day and as part of the transaction, he gave her his bond for ten thousand dollars (the amount she had actually paid out of her own funds) secured by a mortgage. The firm of which

he was a member failed and made an assignment of all their
individual and copartnership property for the benefit of their
creditors, and in the schedule was this property.    The deed
from Mrs. Grain to him and mortgage from him to her were
not recorded until after the deed of assignment was made.
The assignee took possession of the property on the theory
that the legal title was in Mr. Grain and a bill in equity was
filed against him to set aside the deed from Mrs. Grain to
her husband to remove the cloud from the title, etc.    The
Court said, " The statement of facts makes it certain that in
the case before us the husband did not intend to make and
the wife did not suppose she had received a gift.    The hus-
band placed the title to the property in the wife's name to
secure the payment of her advancements upon it and in
trust for himself for the remainder ; in trust upon his request
to convey it to himself or to such person as he should ap-
point, subject to the incumbrances.    The deed of August
5, 1873, from herself to him, if effective for no other purpose,
is in the nature of a formal written declaration and acknowl-
edgement of that trust, and was an effort to carry it into
existence."    The Court then said that as the parties in in-
terest were before it and the equities known, it would not
dismiss the petition, but directed the sale of the property,
payment to Mrs. Grain of the amount she had in the prop-
erty, and of the balance to the assignee.

" The case of *Benscotter* v. *Green and Wife*, 60 Md. 327,
is somewhat in point, as to the relief prayed for.    There an
agreement had been made by Green and wife to support
Benscotter and wife and their daughter during their several
lives, and to make certain payments in consideration of Ben-
scotter and wife conveying to them the property involved
in the controversy.    The Court on page 332 said:  " Having
accepted the deed under such written agreement, the ap-
pellees in equity are bound faithfully to perform the duties
assumed and the land ought to be charged with that trust.
In fact the agreement provides in terms that the whole
arrangement shall be void on failure of the appellees to do

what was agreed to be done by them.　We think the transaction does create a trust which ought to be declared.　*Story's Equity*, secs. 1197 and 1198."

"The case of *Gebb* v. *Rose*, 40 Md. 387, relied on by the defendant, is not, in my opinion, in conflict with the position taken by the plaintiff.　In that case a married woman, who was then the owner of the property, undertook to convey it and the Court of Appeals held that her deed was void at law and in equity, as she had no power to make such a deed.　But in this case it is not a question as to whether she had the power to make the agreement filed with the bill, but whether she can take property conveyed to her on the terms of that attempted agreement, and then repudiate the terms and still hold the property.　The writing signed by her is some evidence, when taken in connection with the allegations of the bill, of what the terms were on which the property was conveyed to her, and if those allegations are true a trust is raised which can be declared by a Court of Equity.　Of course I am dealing here with a case between husband and wife, and not with one where rights of creditors are involved.

"Being then of the opinion that a Court of Equity can give relief on such facts as are alleged in the bill and declare a trust, I must overrule the demurrer.　Whether or not the facts can be established in such a clear and positive way as would authorize the Court to pass a decree, will present another question.　I am now proceeding on the well-established rule that all the facts properly stated in the bill are by the demurrer admitted to be true for the purposes of the ruling on the demurrer.　I will give the defendant thirty days in which to answer."

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE and PAGE, JJ.

*Ferdinand Williams* and *George A. Pearre*, for the appellant.

*Robert R. Henderson*, for the appellee.

FOWLER, J., delivered the opinion of the Court.

The appellant, who was plaintiff below, filed his bill of complaint in the Circuit Court for Allegany County for the purpose of establishing a trust to receive during his life the rents and profits of the property which is the subject of this controversy.

He executed an absolute deed to his wife, dated the 28th May, 1888, for the purpose, as he alleges, of securing a loan of $2,000, which, however, she refused to make, and he did not then deliver the deed or have the same recorded. However, being desirous of settling the property upon his wife, she agreed with him, he alleges, that if he would deliver the deed in question to her without any money consideration whatever, she would allow him to collect for his own use the rents and profits during his life. Relying, he says, upon this agreement, he filed the deed for record on the 26th Oct., 1889, but before so doing, his wife entered into a written agreement with him dated the same day the deed was recorded to lease the premises to him during his life for the nominal consideration of one hundred dollars. The property in dispute was purchased by the plaintiff for the sum of six thousand dollars on the 5th Sept., 1885, and is located on the S. E. corner of Centre and Henry streets in Cumberland. Its rental value is placed by the plaintiff at $700 per annum. The defendant in her answer gives an account of this transaction which differs radically from that given by her husband. She alleges that his purpose in conveying this valuable property to her was to prevent trouble to himself arising out of some alleged infringements of patent rights in some dental materials which he had been using in the practice of his profession of dentistry. She feared, she says, that he intended by this conveyance to her to defraud his creditors. She finally, however, consented to take an absolute deed for the property worth $6,000, in consideration of a $1,000 bond she had given him soon after their marriage, some twelve or fifteen years before this transaction, and in further consideration that he had lived

in her house, and had enjoyed for many years the rents of other property owned by her. She further alleges that this understanding between herself and her husband was fully consummated in May, 1888, and that if the deed was not then recorded it was a fraud upon her rights. She also alleges in her answer that the written agreement signed by her, and which her husband alleges was executed in pursuance of her agreement to allow him during his life to enjoy the rents, was procured through his fraud and deceit, or if not by fraud and deceit then by duress. She alleges that the agreement to lease was signed under duress, and in the same breath she says she signed it because he told her the paper was only a power of attorney to collect the rent for her.

There was a demurrer filed to the bill on the ground that any such agreement as is alleged to have been made by the defendant is void, because she is a married woman, but the learned Judge below held, and we entirely agree with him and adopt his opinion upon the demurrer, that the defendant could not take the property conveyed to her subject to the alleged agreement to allow her husband to collect the rents during his life, and then repudiate her agreement as void and hold on to the property. A Court of Equity will not allow such a fraud to be perpetrated. The learned Judge below quoting from *Crampton* v. *Prince*, 83 Ala. 246, said : " It is as unconsionable for a married woman to get the land of another without paying the purchase money, as for one *sui juris* to do the same thing." The same principle, he said, is applicable to this case, and that " it would be as inequitable to permit married women to get property for nothing with the understanding that the grantor should enjoy it for life, and then refuse to carry that out, as it would be for one who is *sui juris*." But, as we have said, we adopt the opinion on the demurrer filed in the Court below, fortified as it is by sound reasoning and abundant authority.

The controlling question, therefore, we have to consider,

is one of fact, and it is whether the agreement between the plaintiff and defendant was made at the time and for the considerations alleged by the former. If, as he alleges, the deed was delivered to her upon the clear and express understanding that he was to enjoy the rents during his life, she will not be allowed to set up her title under the absolute deed to defeat her husband's claims. This question must be solved mainly upon the testimony of two witnesses, the plaintiff and defendant.

The contention of the plaintiff would seem under the circumstances of this case to be certainly the more reasonable. The defendant had, as she terms them, certain " invested investments " in real estate in Cumberland, and she also had some investments in bonds. In answer to the question as to the amount of income, outside of the property here in dispute, she said it amounted to about $700 subject to deductions for taxes, &c. The plaintiff owned little except the Henry street property, here involved, having previously given his wife almost everything else he had. He says that wishing to settle this property also upon her, and having confidence in her, he made to her an absolute deed—or rather delivered by recording the one he had prepared for the purpose of securing a loan from her of $2,000, which loan as we have seen she finally refused to make. It would seem very remarkable that he should not under these circumstances have had the prudence and foresight to secure for himself, during life, the enjoyment of the income from this property—being all that he had. And this is exactly. what he says he intended to do and did—by means of the alleged agreement. His statement is clear, consistent and convincing. We will let him speak for himself; he says : " On or about the 28th October, 1888, I wanted money to manufacture and advertise dental specialties, some of which I invented myself. I told my wife if she would loan me $2,000 I would make her a deed, as security, to my Centre-Henry street property. She said ' If you do that I will loan you the $2,000 ;' then I made the deed. I took it to her

and she said 'I won't let you have this $2,000; I do not want your property.'" The defendant having refused to loan the money, the plaintiff, of course, did not deliver to her the deed which he had prepared. He says: "I declined to deliver the deed or have it recorded. I placed it in my safe and it laid there nearly a year when my wife said to me: 'If you will have that deed recorded without the payment of the $2,000 I will sign any paper you bring me *giving you a life interest—you to collect the rents during your life.*' I accepted this proposition and had the deed recorded. On the same day I prepared a memorandum for a lease." This memorandum, he says, was signed the same day, Oct 26— before the deed was recorded. It is a brief and imperfectly drawn agreement for a lease by which the defendant agrees to lease to the plaintiff for life this valuable property producing $700 per annum, for the nominal sum of $100. Subsequent to this transaction the plaintiff improved the property to the extent of $1,200 and continued to collect and enjoy the rents from October, 1889, until July, 1895, when the plaintiff and defendant separated and the latter notified the tenants that they should pay the rents to her. She has been collecting them ever since. It also appears from the plaintiff's testimony that he had expended $2,600 in improvements placed on certain vacant lots. The defendant contradicts flatly this account of the transaction. She says that while sitting in her room one day the plaintiff came in with a deed for the Henry street property; that he was afraid of being sued for crown and bridge work infringement or vulcanite rubber; that he did not care to have any property in his name but that he wished to be agent. She called his attention to the consideration of $2,000 and told him she could not possibly pay it, and wouldn't if she could. To which he replied, you have already given me $1,000 which bore me $70 for many years, which with other sums she had advanced would make the amount named in the deed. She then told him she was afraid he was about to defraud his creditors, but he denied it. After making other

objections, and requiring him to destroy a power of attorney
she had given him to collect the rents of her property in
Cumberland, she says she finally agreed to accept her hus-
band's deed.   He said he would have the deed recorded,
and although he never brought the deed to her she thought
it was all right as she knew it made no great difference as
it had been recorded, and would be quite sufficient at any
time to prove her ownership.

In regard to the execution of the agreement to lease, she
says :

" Some months after, I think probably a year, after his
having given me deed for the corner, he came to me and
represented that he was having a great deal of trouble with
different tenants, to distrain them when they were delinquent
in their rents, &c.   He said that he had no power to prop-
erly look after these things unless he had a properly drawn
up paper for agency.   I said, ' Are you sure that is all you
want ?'   He said, ' Why, certainly, havn't you already pre-
viously given me such papers to manage your affairs, and
why not this, as I am looking after yours and the children's
interests, and you are away from home a good deal and
when away I can do nothing with them.'   I at that time
thought very little about business or the proper purport of
any kind of business papers.   He had one in his hand, the
one shown, I think, and said that he had taken it out of a
book that he had in his office, and that it only constituted
him a manager for me for this property.   He wished me to
sign it.   I had my little daughter on my lap at the time
away from any light, so asked him to read it for me, not
thinking but what he would do it in a proper manner.   He
suppressed to the best of my knowledge and remembrance
the beginning of it, the lease, or adding it on afterwards,
because I knew nothing about its purporting to be a lease,
and supposed it to be similar to the paper I formerly burned
on the Centre street property.   Even then, believing as I
did, objected to tie myself up in any way, but as things at
our house were extremely unhappy at that time and wish-

ing at almost any price for peace and harmony, I finally reluctantly signed my name. My small son James being in the room with me his father told him to write his name also." She was then asked by her counsel if any other inducements or motives influenced her in signing this paper. Her reply was she had answered that question in the affirmative. She was then asked if the plaintiff had ever tried to compel her to sign such a paper, and if so, how. She replied, " I think I have answered that question also." And finally she was asked whether the plaintiff had ever threatened her in any way with reference to the property in question. And she said, " About the time I refer to he began repeatedly to solicit me in the most urgent manner to sign such a paper. I fearing to make him angry, from time to time put it off without definitely saying that I would never give it to him, but always thinking, of course, that he simply referred to my making him my agent, as I had previously done. At last I was so unhappy that I determined to try what obliging him in this as in many other ways, would do for me." On cross-examination she admitted that the plaintiff had never been threatened with suit for infringements, so far as she had heard, and denied that she had any knowledge that he intended to defraud his creditors. She suspected it. But there is no proof whatever before us that the plaintiff was guilty of any such conduct. The charge, or more properly speaking the suggestion (for she denies having made the charge), rests upon the unsupported suspicions of his wife.

There is one other witness, Dr. J. Jones Wilson, whose testimony rather tends to confirm that of the plaintiff. He called to see the defendant just after the separation in January, 1895, and tried to effect a reconciliation. But he soon found that to be impossible, and suggested an equitable division of the property of the plaintiff and defendant. He suggested that the plaintiff ought to relinquish any right he might have to the buildings he had erected and paid for on her lots, and that she ought to deed the property on Henry street back to him. She replied this suggestion would be

all right, but for the fact that the plaintiff might get a divorce from her and marry another woman and have children, who would get the Henry street property if she deeded it back to him, and that she intended to keep it for her children. She said she would never molest him in any way about the property during his life, and that he could have the rents as long as he lived. This witness subsequently had a conversation with the defendant in which he expressed surprise that she claimed the rents. Her reply was, "I have changed my mind." Of course, most of this testimony was contradicted by the defendant. We have thus at considerable length given the testimony of the only witnesses who have said anything relating in any way to the transactions which have resulted in this unfortunate controversy. We would gladly avoid if we could the necessity of commenting upon the case thus presented. But it is our duty not only to determine on the evidence on which side lie right and justice and truth, but also to give our reasons for our conclusions—which we will proceed to do as briefly as possible.

In the first place it is, of course, conceded that the deed in question was recorded on the 26th October, 1889—although dated May 28th, 1888. Now it is a most significant fact that the informal agreement by which the defendant agreed to lease the property to her husband for life for $100 bears the same date the deed was recorded. And that it was executed on that day there appears to be no doubt. The plaintiff so swears and he is not contradicted—except by the defendant, who says she never knowingly at any time signed any *such* paper. But there is nothing in her testimony to disprove the fact that a paper was signed by her about that time. It follows that if the deed was not recorded until 26th Oct., 1889, the plaintiff had up to that time a clear fee-simple title to the property—his deed to her being in his own possession and never having been delivered to the grantee. If this be so, does it not seem very improbable that the plaintiff would have resorted to fraud and duress or either to induce the defendant to sign the agree-

ment which only gave him a leasehold interest for life ? He was the owner of the property in fee, and no amount of fraud or duress could enlarge his interest. The plaintiff swears that the agreement was signed before the deed was recorded, that is while the title was still in him, and the body of the agreement would seem to confirm this statement, for if the deed which was dated May, 1888, had been delivered and was complete, that deed would have been referred to in the agreement, but it is not mentioned either by way of recital or otherwise—but the property is therein described as the property corner Centre and Henry streets, being the same which was conveyed to the plaintiff by Wilson and wife by deed dated and duly recorded, &c. It was the plaintiff's property and was so described. But it was suggested that the fact that the deed was recorded so early as 9.20 A. M. throws some doubt upon his statement that he prepared the agreement the same day and before the deed was recorded. But, as we have already said, the paper is imperfect and short and could have been prepared in a few minutes even by a layman and doubtless was intended only for temporary use—the intention being to prepare later a more formal one. That this was the purpose of the plaintiff appears from his testimony. He says : " It was only intended to be for a short while, and I desired to have something to show I had a life interest in the property in case of accident or death.'' And he also said that he never thought the agreement was worthless, but he thought it was genuine, and she was afterwards to give him a lease that would be legal. This testimony explains what would otherwise be, to say the least, difficult to understand, " why the plaintiff would have accepted an unacknowledged and unrecorded agreement to lease the property to him for life, if it was the consideration upon which the deed was delivered.'' Experience teaches us, however, that much greater risks are taken in much larger transactions even between strangers. But after all the defendant had in his hands when the agreement was executed and delivered,

what he called "Evidence," which will afford him ample protection in a Court of Equity, unless he was, as charged by his wife, guilty of fraud and duress in procuring it.

While it may be difficult to explain some of the transactions between the plaintiff and defendant, yet we cannot be expected to hold, without proof of any sufficient motive on his part, that he would perpetrate a fraud on his wife to deprive himself of a fee-simple interest in his property in order to vest it in her and get for himself only a life interest. She, and she alone, has suggested, without any evidence to justify it so far as we have been able to ascertain, that he wanted to convey the property to her to defraud his creditors.  If there are any creditors none appear to have been found.  It is true the defendant says that the plaintiff had been sued before a magistrate by some one; but it is incredible that he would convey away property worth $6,000 to evade the payment of a possible claim less than $100. Nor do we think it probable that a woman of such intelligence and knowledge of business, especially when, as she says, she suspected her husband was trying to get something more than a mere power of attorney, would have signed that paper without reading it carefully.

Forbearing to further comment upon the testimony, we are forced to the conclusion upon all the evidence in the cause, that the agreement of the defendant to allow the plaintiff to enjoy during life the rents of his property was the real consideration of his deed conveying the property to her and that he is entitled to the relief prayed.  None of the exceptions to testimony have been relied upon in this Court, and we will not therefore discuss them.

*Decree reversed and cause remanded.*
*Each side to pay its own costs.*

(Decided January 5th, 1898).