[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a dispute arising out of the planning and construction of the New Haven City Hall.
The predecessor in interest to the defendant CFC Construction Limited Partnership (hereinafter CFC) hired the plaintiff Herbert S. Newman and Partners (Newman) to provide architectural services for the development of a design concept for the site in downtown New Haven to be designated as the Government Center. Included on the site was the sole remaining structure of the old City Hall complex. A new City Hall was contemplated for the site, incorporating in part the old City Hall building.
Eventually, the plaintiff was hired to design the structure and the City entered into an agreement with another Chase entity to act as contractor. CFC assumed all obligations under the Owner-Contractor Agreement on February 11, 1989. CT Page 11805
The City required that CFC provide a bond to guarantee payment to all who performed work or supplied material to the project. CFC obtained a surety bond from the National Union Fire Insurance Company (hereinafter National Union). In pertinent part, the bond provided that:
 "Any party, whether a subcontractor or otherwise, who furnishes materials or supplies or performs labor or services in the prosecution of the work under said contact, and who is not paid therefore, may bring a suit on this bond in the name of the person suing, prosecute the same to a final judgment, and have execution thereon for such sum or sums as may be justly due. [Emphasis added.]"
Until June 30, 1988, there was apparent harmony between CFC and Newman. Then, on June 30, the parties agreed that monthly billings would not exceed $6,000.00. This apparent modification of the contract was never implemented by either party and invoices were submitted and paid without incident until 1990 when CFC became delinquent.
The parties then had discussions and exchanged letters over a purported settlement of all outstanding arrearages, and according to a CFC principal, all services to be rendered. When CFC failed to pay according to the Newman understanding of their agreement, Newman resumed the prior billing process.
At no time did CFC protest these billings, assert its version of the "settlement", or indicate any dissatisfaction with the plaintiff's services.
On June 21, 1990, the City terminated CFC's participation in the project because of a lack of progress toward completion. The final day for CFC's presence on the site was July 2, 1990. Newman continued to do project representation on several aspects of the work. Both CFC and National Union protested the City's action and both declined to pay the plaintiff for the balance it claims is due.
I. THE SURETY BOND
In a case of first impression in Connecticut, the defendant National Union seeks to avoid liability on its performance bond for CT Page 11806 the amount due to the plaintiff because the plaintiff failed to distinguish between work it performed on-site and work it performed off site.
According to this defendant, "architects and other design professionals may only recover for on-site supervisory or inspection service." (Brief, p. 10.) The defendant concedes that no Connecticut case adopts this view but argues that this is well settled under federal law and federal law controls this case.
The defendant relies heavily on two federal court cases,United States v. Butt Head. Inc., 535 F. Sup. 1155 (S.D. Ohio 1982), and United States v. W. H. Cates Construction Co., Inc.,972 F.2d 987 (8th Cir. 1992). Both these and other federal court cases cited support the position of the defendant.
The Miller Act, which is the subject of these federal cases, reads in pertinent part as follows:
 "Before any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":
Section 270b of the Miller Act states in pertinent part:
 (a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under Sections 270a to 270d of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for such claim is made, shall have the right to use on such payment bond for the amount, or the balance thereof. . . . CT Page 11807
The Connecticut General Statutes governing contracts for the construction of public structures includes § 49-41, captioned "Public structures. Bonds for protection of employees and materialmen." It proceeds to mirror the language of the Miller Act and § 49-42 is virtually identical to § 270b(a) recited above.
The Court does not dispute the defendants' claim that § 49-41
should operate in general conformity with the Miller Act and that in deciding issues of first impression under it, the federal Miller Act cases should be examined. However, a close reading of these federal cases reveals a decided awareness on the part of federal court judges that there are distinct limits to the application of the Miller Act as well as an awareness that the federal case law on the subject is different from state case law. Thus, in Butt Head, Inc., the Court notes:
 "However, it is also true that federal case law has adopted an admittedly somewhat narrow definition of the term `labor' in § 270b(a), that is, covering only skilled professional work which involves actual superintending, supervision, or inspection at the job site."
Id. at 1160.
In that same case, at page 1158, this excerpt from footnote 2 is revealing:
 . . . The Rich decision has been subsequently interpreted to mean that state law is not an appropriate reference when the Miller Act itself, rather than the contract between the parties, is to be interpreted. . . .
(Emphasis added.) Consequently, in this case, state law is appropriate as this is not a Miller Act case and the contract between the parties is at issue.
There is no question that the defendant National Union, the surety, by executing the bond acquires obligations which are coextensive with that of the principal. Star ContractingCorporation v. Manway Construction Co., 32 Conn. Sup. 64, 66-67
(1973). (Citations omitted.) CT Page 11808
The bond in question here was filed pursuant to § 49-42. The defendant CFC was principal and National Union was surety. Protection was guaranteed to "any party, whether a subcontractor or otherwise, who furnishes materials or supplies or performs labor or services in the prosecution of work under said contract." (Exhibit K.)
The Court finds it significant that the bond does not merely repeat the language of the statute, rather, the phrase "whether a subcontractor or otherwise" was inserted. And, in addition to using the word "labor" as does the statute, the word "services" is added.
The logical conclusion one must draw here is that some other types of claimants were anticipated and that "services" other than those usually associated with "labor" were contemplated.
This language, examined in the context of the Owner-Contractor Agreement (Exhibit E) compels the conclusion that all work done by the plaintiff was intended to be covered by the bond, by virtue of its inclusion in the contract. First of all, CFC was required to hire the architect. Then, the duties the plaintiff was to perform were listed, including: periodic site visits, review of contractor's applications for payment, interpretation of requirements of the Contract Documents, and rendering decisions on claims, disputes and other matters in question between the contractor and the owner.
Obviously, many of these functions would be performed off-site, so that National Union is asking for an interpretation which would have the principal liable on the total contract, while the surety would be liable for somewhat less. (Actually, with the plaintiff lacking a breakdown of on-site and off-site work, National Union claims it should pay nothing.)
The plaintiff points out that in none of the cases cited by the defendants was the claimant a "first tier subcontractor", i.e., one hired directly by the general contractor. Citing a Court of Appeal case from Louisiana, the plaintiff notes its similarity to this case and quotes from the decision:
 "[T]he jurisprudence on the issue indicates that the contractor suretyship bonds are designed to secure performance of the contract referenced therein. In the instant case, the contract referenced in the surety agreement CT Page 11809 was a design/build contract. . . .
 Since the suretyship contract must be strictly construed in favor of Nicholson Loup, the trial court properly applied the surety agreement to the entire design/build contract. Since the contract covered by the accessory promise placed both design and build responsibilities on the principal, the surety contract, when interpreted strictly, must be construed to cover both aspects of this project."
Nicholson Loup, Inc. v. Carl E. Woodward, Inc., 596 So.2d 374,596 (Lou. Ct. App. 1992).
The Court rejects the defendants' argument that it is bound by federal court decisions. The State is the final arbiter of its own laws. State v. Menillo, 171 Conn. 141, 147 (1976).
In seeking guidance from federal case law, our Supreme Court has found that a liberal construction of statutory requirements has been recommended. Okee Industries, Inc. v. National Grange MutualIns. Co., 225 Conn. 367, 373-374 (1993).
This liberal construction doctrine has been exhibited in any number of Connecticut Supreme Court decisions, of which the following is typical:
 We have previously said that statutes such as § 49-41 are to be literally construed; Pelton King, Inc. v. Bethlehem, 109 Conn. 547, 553, 147 A. 144; and that the protection which § 49-41 affords is to be applied without reference to whether, as against a private owner, a mechanic's lien might attach for claims for labor or materials furnished. Id., 556. We have also said that where a statutory bond is given, the provisions of the statute will be read into the bond so that it is immaterial that, as in this case, the bond varies from the wording of the statute. New Britain Lumber Co. v. American Surety Co., 113 Conn. 1, 5, 154 A. 147. Beyond this, the interpretation of the statute must be approached on the premise that the purpose ofCT Page 11810 the bond under § 49-41 is to facilitate the expeditious and uninterrupted completion of public works by furnishing a means through which suppliers of labor and material in the prosecution of the work are afforded protection in extending credit to contractors. The intended beneficiaries are the public, the laborers and the materialmen rather than the surety or the principal contractor.
(Emphasis added.) International Harvester Co. v. L. G. DeFelice Sons,Inc., 151 Conn. 325, 333 (1964).
The Court concludes that the position advocated by these defendants is illogical and contrary to the policy enunciated by our courts. The defendants would have public projects proceed with those situated similarly to the plaintiff herein having no assurance of payment. A further result would have our courts deciding what work was done on or off site. That consideration would be clouded by imaginative defendants who would argue that work was done on site merely to satisfy the legal requirement, but that it could and should have been done off site, in which event the surety company could walk away.
The Court concludes that National Union is liable on this surety bond, both by virtue of the express language of the bond because our statutes should be construed liberally to reach the logical results contemplated by our legislature in adopting them.
II. THE STATUTE OF LIMITATIONS
The defendant National Union has also pleaded the statute of limitations in that § 49-41 of the Connecticut General Statutes requires that an action seeking payment on a statutory bond be commenced within one year of the date services were last rendered.
There is no dispute that on June 21, 1990, the City of New Haven sent a notice which advised CFC that its status as general contractor was being terminated.
The complaint in this action is dated June 24, 1991, and was served the following day. The City's notice to terminate was effective on July 2, 1990. Both defendants, CFC and National Union, protested this termination and noted the absence of an architect's certificate of cause, required by the contract. CT Page 11811 (Exhibits Q, M and N.) The plaintiff advised the City of this fact on July 30, 1990, acting at the request of CFC.
Though the defendants suggest the Court ignore it, the plaintiff presented the testimony of an employee, Rai Muhlbauer, the project architect on the job. He stated that on June 25, 1990, he worked on roof sketches and electrical strikers on doors and discussed with CFC and others the transition from CFC control to the City. His work continued for several days in accordance with the contract.
The Court finds this witness credible and rejects this defense. The court finds that the plaintiff performed contract and necessary services up to July 2, 1990.
III. ACCORD SATISFACTION
In March of 1990, Herbert S. Newman had a phone conversation with David Chase. In that conversation, Newman, on behalf of the plaintiff, agreed to accept the sum of $200,000 in full payment of its outstanding invoices.
When the defendant CFC sent its first payment of $100,000 on account of the settlement, the plaintiff accepted it and cashed it. Then, Newman wrote to CFC and stated that the agreement as stated by CFC in the letter accompanying the check was in error and the final payment was due on May 28, and not, as CFC claimed, "upon substantial completion." The parties spoke, but never resolved this issue. CFC then made the second payment and the plaintiff accepted it and cashed the check.
The final $50,000 payment was not tendered on May 28 and on June 21, CFC was ordered off the job by the City so that the event requiring the last payment never occurred.
The defendant argues that the parties entered into this settlement, that it replaced any prior indebtedness and thus defeats the plaintiff's claim of $184,793.02. Basically, the claim is that "the new agreement, as opposed to its performance, discharges any contractual obligations." (Brief, p. 26.) It goes on to then assert that not even the final $50,000 need be paid because the project, as to CFC, never reached "substantial completion." However, the defendant goes a step further. The testimony of David Chase as to this "settlement agreement" was that the agreement not only contemplated payment of all past due bills, CT Page 11812 but paid all future work as well.
The Court does not find Connecticut case law supporting the defendants' position. In Audubon Parking Associates Ltd.Partnership v. Barclay Stubbs, Inc., our Supreme Court stated:
 "An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty. 2 Restatement (Second), Contracts § 281 (1982); W. H. McCune, Inc. v. Revzon, 151 Conn. 107, 109, 193 A.2d 601 (1963). If there is a breach of the accord, the obligee has the option of either seeking enforcement of the original duty or seeking enforcement of any obligation under the accord. 2 Restatement (Second), Contracts § 281 (1982; see also Montgomery v. Smith, 40 Conn. Sup. 358, 361, 499 A.2d 444 (1985); Girasulo v. Consolidated Motor Lines Inc., 5 Conn. Sup. 245, 247-48 (1937). Thus, in the present case, the plaintiff had the option of either pursuing its claim for breach of the lease agreement or enforcing the duties under the accord.
225 Conn. 804, 809 (1993). Even if there were an accord, CFC did not perform in accordance with it, never having made the last payment.
The defendant CFC relies on a 1939 Supreme Court decision,Taft v. Valley Oil Co., Inc., 126 Conn. 154. However, this case can be distinguished by virtue of the fact that there was a question as to the intent of the parties. At page 160, the Court noted:
 The finding clearly shows an accord when the new contract was entered into. The question as to whether the accord was actually satisfied by the promise of employment or was to satisfied by employment in the future is one of intention. Goodrich v. Stanley, 24 Conn. 613, 623; McGovern Granite Co. v. Veterans' Home Commission, 124 Conn. 304, 308, CT Page 11813 199 A. 441; Halloran v. Fischer, 126 Conn. 44, 9 A.2d 290; 10 A.L.R. 222, 234, note; 1 Am. Jur. 251, § 65, 253, § 67. This intention is not found and there is nothing in the record to show whether the new contract is an accord and satisfaction a claimed by the defendant or an executory accord as claimed by the Plaintiff. If it was an accord and satisfaction, the new contract became substituted for the contingent fee contract, extinguished it and damages should have been based on the breach of the former. Riverside Coal Co. v. American Coal Co., 107 Conn. 40, 47, 39 A. 276. In such a case, the partial failure of consideration for the new contract would give the plaintiff rights under it, but would not permit him to regard it as never having come into effect and to fall back upon the breach of the original obligation as a measure of damages. (Citations omitted, emphasis added.)
There is a further weakness in the CFC claim of accord and satisfaction. To show an accord, the defendant must prove a new contract based upon a new consideration and there must be a meeting of the minds. Crucible Steel Co. v. Premier Mfg. Co., 94 Conn. 652,656 (1920). The Newman letter recited a difference in the plaintiff's understanding of the timing of the final payment, and a further disagreement as to how much the plaintiff had already been paid, as that amount was considered in determining the "settlement" figure. (Exhibit 6.) In fact, that letter suggests an increase in the final payment might be required.
The Court does not find that there was a mutual understanding between the parties, a basic requirement for a valid contract.
 In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. Hoffman v. Fidelity Casualty Co., 125 Conn. 440, 443-44, 6 A.2d 357 (1939); Zahornacky v. Edward Chevrolet, Inc., 37 Conn. Sup. 751, 753-54, 436 A.2d 47
(1981); see also Bridgeport Pipe Engineering Co. v. DeMatteo Construction Co., 159 Conn. 242, 249, 268 A.2d 391 (1970). `If there has CT Page 11814 been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make.' Hoffman v. Fidelity Casualty Co., supra. `"[A]n agreement must be definite and certain as to its terms and requirements."' Dunham v. Dunham, 204 Conn. 303, 313, 528 A.2d 1123 (1987).
Fortier v. Newington Group, Inc., 30 Conn. App. 505, 510 (1993).
This principal applies to contracts purporting to constitute an accord.
 In this case, while both parties agree that there was an accord between them, they dispute the terms of that accord. We are not persuaded by the defendant's argument that this dispute is irrelevant. Without a mutual assent, or `meeting of the minds,' there could be no accord. See Crucible Steel Co. v. Premier Mfg. Co., supra. Whether there has been a mutual assent between the parties is a question of fact for the jury to decide.
Gillis v. Gillis, 21 Conn. App. 549, 552 (1990).
The defendant CFC also argues that the acceptance and cashing by the plaintiff of the $100,000 check constituted an acceptance of the terms of the settlement. The plaintiff responds by referring to its letter of April 12 (Exhibit 6), dated six days after the date on the defendant's letter accompanying the check. In that letter, the plaintiff sets forth its disagreement with the settlement terms claimed by the defendant.
Connecticut case law supports the proposition that failure to return a check tendered in satisfaction of an accord does not necessarily amount to an acceptance of the debtor's terms of the accord. Kelly v. Kowalski, 186 Conn. 618 (1982). In that case, in finding that the creditor was not bound by the debtor's interpretation, the Court noted these facts as significant:
1. The payment was accepted under protest; CT Page 11815
2. The debtor was advised of the protest;
3. The debtor did not request a return of the check;
 4. The debtor took no action to stop payment, though in this case that might have been futile.
The Taft v. Valley Oil Co. case, supra, relied on by CFC, also supports the principal that receipt of payment, even when tendered in full satisfaction of a debt, is not conclusive evidence as to he creditor.
IV. ADDITIONAL WORK PERFORMED
The defendants also argue that the plaintiff's bill is for the same work it contracted for at a set price and that the total of all the fees charged are "unreasonable."
The plaintiff presented the testimony of its employee, Don Cosham, who contradicted these assertions and, in answer to a question from the Court, explained why the project's architectural costs were so high. These reasons had been set forth by Mr. Cosham in a three-page letter with attached summary sent to CFC under date of August 10, 1989.
One of the major items of expense was occasioned by the use of minority subcontractors who were not qualified to perform the difficult work required for this project. Much of their work had to be corrected and/or re-done. These subcontractors were selected and hired by CFC, and CFC accepted the requirement of the City that it hire minorities as a condition of its selection as the contractor.
Mr. Cosham also explained the difficulties involved in this construction, not the least of which was the need to preserve the shell and stairway of the old City Hall and to "insert" this building into the middle of existing construction.
The Court rejects the defendants' characterization of this testimony as suggesting "the architect is free to charge additional sums over and above any agreed limit when it decides in its sole discretion it should do so, regardless of whether the other party agrees." CT Page 11816
In fact, the Court finds it significant that CFC received these billings and paid them without protest until the discussions in March of 1990 which led to the disputed settlement agreement discussed above under the accord and satisfaction defense.
The discussion above is also relevant to the allegation of unreasonableness. Mr. Cosham testified as to how the fees were computed and what was done to justify them. Exhibit 1, Mr. Cosham's letter of explanation, indicates this was not a run-of-the-mill project in which the ordinary percentage of the total cost is relevant.
The plaintiff argues that the defendants should be estopped from denying payment or coverage for the work performed under the contract after July 2, 1990.
Both defendants protested the City's termination and both communicated with the plaintiff on this issue. In fact, CFC requested the plaintiff continue to perform pursuant to the contract. The Court must conclude that these defendants induced the plaintiff to proceed, that he did so at their behest and was injured thereby. As late as July 25, 1990, Cheryl Chase Friedman directed the plaintiff to process change order requests.
The claim of estoppel requires the proof of two elements; "[T]he party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance of those facts, thereby incurring some injury." O'Sullivan v. Bergenty, 14 Conn. 641, 648
(1990). The doctrine of estoppel is appropriate for application in this case.
V. BREACH OF CONTRACT
The plaintiff also claims a breach of contract. The defendant has not directly answered this argument, but has treated with the contract in its defenses of accord and satisfaction, unreasonableness of fees, and the contention CFC never agreed to the performance of additional work. The Court has dealt with the issues raised in these defenses elsewhere.
The Court finds the plaintiff's arguments as to a breach of contract persuasive. Initially at trial, CFC denied a contract existed. This position was apparently abandoned when its CT Page 11817 principals were shown to be involved in extensive activity involving the documents, the project and the plaintiff.
The defendant makes much of the fact that on June 30, 1988, the plaintiff agreed that billings would not exceed $6,000 per month. (Exhibit 4.) This contract modification was never fully explained and Exhibit 4 is not clear as to its import, for while Newman agreed not to bill in excess of $6,000 per month, it is not clear that the plaintiff was thereby agreeing not to perform services for contract administration when the cost of those services reached $6,000 in any month, or whether he was merely spreading out the billing process.
Whatever the argument, the plaintiff did not abide by it and the defendant CFC continued to process and pay invoices in excess of $6,000 without protest. This course of conduct between the parties urges the conclusion that this modification of the contract was abrogated by mutual action and agreement.
Though their brief contains hints that the plaintiff was charging what it pleased, the defendants have presented no evidence to suggest that the plaintiff did not provide the services for which it submitted invoices. Nor was there even a hint that the services were improperly performed.
The Court concludes there was a breach of the contract by CFC, and National Union as surety is as liable as CFC. The plaintiff is entitled to interest on its principal claim of $184,793.02 at the rate specified in the contract, one percent per month.
The commencement date for the computation of interest presents a further problem, as some of the unpaid invoices go back to 1989. Under the circumstances of this case, the proper date would appear to be the date of the last payment made by CFC — the $50,000 payment of April 4, 1990.
VI. SPECIAL DEFENSES AND COUNTERCLAIM
The defendants have presented no evidence, nor have they briefed the issues alleged in Special Defenses 1-4 and in their counterclaim.
Judgment may enter for the plaintiff on these special defenses and counterclaim. CT Page 11818
CONCLUSION
Judgment may enter against both defendants for the principal sum of $184,793.02, plus interest at the contract rate of one percent per month from April 4, 1990.
The plaintiff is entitled to taxable costs.