596 So.2d 374 (1992)
NICHOLSON & LOUP, INC.
v.
CARL E. WOODWARD, INC., Eustis Engineering Co., Employers Commercial Union Insurance Co., and Larry H. Case.
No. 91-CA-1525.
Court of Appeal of Louisiana, Fourth Circuit.
March 17, 1992.
Rehearing Denied April 22, 1992.
*377 David J. Hebert, John W. Nicholson, Marrero, for Nicholson & Loup, Inc.
Ray S. Clement, Jr., Russell J. Schonekas, Berrigan, Danielson, Litchfield, Olsen, Schonekas & Mann, New Orleans, for Eustis Engineering Co., Inc.
K. Eric Gisleson, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for Carl E. Woodward, Inc.
H. Bruce Shreves, Jay H. Kern, Judy Perry Martinez, Simon, Peragine, Smith & Redfearn, New Orleans, for Emp. Commercial Union Ins. Co.
*378 Michael E. Wanek, Hulse, Nelson & Wanek, New Orleans, for Larry H. Case.
Before LOBRANO, PLOTKIN and BRYAN, JJ.
PLOTKIN, Judge.
This appeal grows out of a complicated factual scenario which requires this court to determine the liability for design defects which resulted in unacceptable differential settlement in the floor slab of plaintiff's supermarket located at 2020 Belle Chasse Highway in Belle Meade, Louisiana.

I. FACTS
By agreement dated June 23, 1972, plaintiff Nicholson and Loup, Inc. (Nicholson & Loup), through its president Elwin J. Nicholson, contracted with defendant Carl E. Woodward, Inc. (Woodward) for construction of a supermarket on the west bank of Jefferson Parish for the estimated price of $929,307. Article 3 of the agreement between Nicholson & Loup and Woodward named Woodward employee, defendant Larry H. Case, as architect for the project. The agreement specifically provided that "[c]ost of plans, specifications and drawings and all architect's fees due Larry H. Case, A.I.A., are included in the lump sum contract price." "Drawings, Specifications, All Addenda issued prior to execution of [the] Agreement and all modifications issued subsequent thereto" were expressly made a part of the contract between the parties. Nicholson testified at trial that he negotiated the contract with Armond LeGardeur, president of Woodward, and that LeGardeur suggested they use Woodward's "in-house" architect, Case, because it would be cheaper, Nicholson stated. Defendant Employers Commercial Union Insurance Co. (Employers) contracted with Woodward to supply a surety bond guaranteeing the performance of the contract in favor of Nicholson & Loup.
Sometime before construction began, Nicholson commissioned a subsoil investigation of the site of the proposed supermarket from defendant Eustis Engineering Co. (Eustis). The evidence presented at trial indicates that Eustis did two 70-foot soil borings on diagonally-opposite corners of the proposed building site, then prepared a seven-page report dated August 20, 1971. John W. Roach Jr., who signed the subsoil investigation report, stated at trial that he never visited the site of the proposed supermarket. The report noted that the surface material at the site consisted of soft black humus containing roots to a depth of 2.5 to three feet, underlaid by very soft to soft gray clay containing varying amounts of organic matter, roots and silt, to a depth of about 15.5 to 17.5 feet. The third layer consisted of very soft to soft gray clay layers extending to 64 to 67 feet. The borings revealed a fourth layer of medium dense gray fine sand to 68.5 feet, followed by a final layer of extremely soft to medium stiff gray clays and sandy clays containing shell fragments. The report lists pile capacities for numerous different length pilings and indicates that a combination of 40-foot piles supporting the interior space and 70-foot piles supporting the exterior and other weight-bearing walls would be appropriate at the site. The report recommends that all loads be pile supported and indicates that settlement will not be a problem in the pile-supported areas. The report discusses "fill material required ... for grade or for drainage purposes," but does not indicate that use of fill will cause any unusual settlement problems. The subsoil investigation was apparently used by Woodward personnel, including Case, in the design of the building.
J.J. Krebs performed a topographical survey of the site which indicated that the property was some five and one-half feet lower than the Belle Chasse Highway. Nicholson told Woodward representatives that he wanted the store to be even with the highway. In compliance with this request, Woodward placed four to six feet of fill on the site prior to construction of the building. The building was constructed pursuant to plans drawn by Woodward personnel and outside contractors hired by Woodward as part of the total contract price. The building is supported by a combination of 40-foot and 70-foot pilings, as suggested by the Eustis report.
*379 The supermarket opened in 1973. Shortly thereafter, Nicholson & Loup personnel started noticing problems with the building, which were eventually determined to be caused by differential settlement in the building slab. Nicholson testified that grocery carts would roll away from shoppers, that the walls started to separate, that doors became stuck, and that the ceiling buckled. Maintenance man John Hilton stated that the shelving in the store "started to look like a roller coaster" in the center aisle, that cement blocks fell out of the wall over the door to the warehouse, that ceiling tiles started to fall out, that the fire exit door could not be opened, that the plaintiff had trouble keeping saws in the meat-cutting room level, that the ramp to the front of the store had to be changed, and that a decorated beam fell down in a snack bar area and almost hit someone. Hilton also testified concerning problems with the coolers, refrigeration lines, down spouts, and hot water lines. Hilton said that he measured in the meat-cutting room and discovered that the floor had settled two and one-half inches just two years after the store opened.
One of the plaintiff's engineering experts, Dr. Richard Avent, inspected the building several times. He testified that the differential settlement in the building slab was as much as six inches in a 15- to 20-foot span in some places, with the average differential settlement between four and five inches. He classified the building damage as primary and secondary. Primary damage, he stated, is associated with the main load carrying element of the structure and includes the cracked floor slab and the step cracks in the exterior walls of the building. Secondary damage he defined as those things not essential to the integrity of the entire structure; secondary damage in the Nicholson & Loup building includes the separation of the interior walls from abutting walls, the overhead crane distortion, and the misaligned doors. Dr. Avent said that the damage to the floor slab, the interior walls, the overhead crane rail, and the door alignment is severe; the damage to the exterior walls is moderate.
Dr. Avent testified that differential settlement in a 30-foot range should be limited to between one inch and one and one-half inches because anything more affects the structural system and may make the building unusable. The building is unacceptable from both a stress criteria and a serviceability criteria, Dr. Avent stated, because the strength of the building has been compromised and the building does not function as it was inteded to function. Additionally, the building is unsafe because of the sloping floor, he stated.
The plaintiff's other engineering expert, Dr. Yalcin B. Acar, stated that the maximum settlement allowed by the engineering profession in a building with a slab is four inches, with a maximum differential settlement of one inch. Thus, he stated, the settlement in the Nicholson & Loup building is far in excess of the amount considered acceptable by the industry. The building also has considerable other damage, he said.
All the expert testimony presented at trial indicates that the differential settlement was caused by three things: (1) the soft compressible soils at the site, (2) the different length piles, and (3) the addition of four to six feet of fill on the property. The evidence reveals that the presence of the four-to six-foot of fill on the property has caused the underlying soils to consolidate and that the 40-foot piles have simply moved down with the soil because of a phenomenon known as "down drag." The 70-foot piles have not moved down with the soil to the same degree because the tips of those pilings are sitting on top of the sand layer. Thus, the floor has settled differentially. The testimony indicates that the differential settlement would not have occurred if the building had been constructed with uniform length piles, because all piles would have moved down uniformly. The problem also would not have occurred if the fill material had not been placed on the site because it is the weight of the fill which is causing the upper layers of the soil to consolidate.
The instant suit, naming Woodward, Eustis, Employers, and Case as defendants, *380 was filed on January 29, 1983. The supermarket closed just prior to trial. After a nine-day trial spread over a 17-month period, the trial court issued judgment holding Woodward, Eustis, and Case solidarily liable for the plaintiff's damages, which he set at $2,538,636. The court also found Employers liable as surety for Woodward and Case for $929,307, the amount of the bond. All parties appealed the judgment to the Louisiana Fifth Circuit Court of Appeal. When all of the judges on that court recused themselves from consideration of the case, the appeal was submitted to this court for resolution.

II. LIABILITY
A. Liability of Eustis Engineering Co.
Defendant Eustis appeals the trial court judgment holding it liable for the plaintiff's damages, arguing that neither the plaintiff nor the other defendants proved the following necessary elements: (1) that Woodward and/or Case used or relied on the subsoil investigation report prepared by Eustis; (2) the proper standard of care for geotechnical engineers in the New Orleans area during the 1971-72 construction period; or (3) that the Eustis report was deficient.
1. Use of and Reliance Upon Subsoil Report
Eustis was commissioned by Nicholson to perform the subsoil investigation on the site of the proposed Nicholson & Loup supermarket in question. The report was apparently delivered to Nicholson personally; Eustis claims that it did not know who was designing or constructing the building. Mr. Nicholson testified that he did not remember receiving the report and that he did not know what he did with it. Woodward president LeGardeur stated that he did not remember receiving the report, but if he did, he would have passed it on to the structural engineer. Case said that he had no use for the soil report in designing the building.
Another reason Eustis claims the soil report was not used in designing the building is the fact that Woodward failed to prove the identity of the structural engineer on the project. LeGardeur and Case both testified that LeGardeur's brother, George, was almost certainly the structural engineer, as he served in that capacity for most of the Woodward projects during the early 1970's. George LeGardeur was deceased at the time of the trial, and Woodward's records on the project were unavailable. Because Woodward failed to conclusively prove the identity of the structural engineer, Eustis urges this court to assume that no structural engineer was used on this project; ergo, Eustis implies, the soil report was not used in the design of the building.
At trial, Eustis presented the expert geotechnical and structural engineering testimony of Walter E. Blessey in an attempt to prove that either Woodward never received the subsoil investigation report or that Woodward did not rely on the report in designing the building. In support of this conclusion, Blessey stated that his investigation had revealed eight "points" where the building design departed from Eustis' recommendations. However, Blessey testified to only the following six departures: (1) the lack of evidence that a pre-load operation, as recommended by Eustis, was ever conducted to allow the soil to settle after placement of the fill before construction began; (2) the fact that the test pile was driven four feet shorter than Eustis recommended; (3) the fact that the 40-foot piles were driven only to a 36-foot penetration because of the fill, when the Eustis report recommended a minimum 50-foot tip elevation; (4) the failure to use a minimum of 50-foot piles under the rear mezzanine wall; (5) the fact that the test load was performed on an oversized pile; and (6) his belief that Woodward failed to use the loads calculated by Eustis. Based on those departures, Blessey concluded that whoever designed the building did not "study" the Eustis report. He later stated that he does not believe that the Eustis report was even read by the designer. The testimony of other experts also establishes the existence of several of these "departures" from the recommendations in the report.
*381 The trial court's decision on this issue, which is completely fact-based, may be reversed on appeal only if the decision is manifestly erroneous or clearly wrong. Our review of the record convinces us that sufficient evidence by which the trial judge could conclude that the Eustis report was utilized in the design of the building was presented at trial. Unquestionably, the foundation, which used a combination of 40-foot piles with 70-foot piles, conformed to the report. Several of the experts, including Roach, specifically stated that the building was designed in conformity with the Eustis report.
Additionally, the testimony of Eustis' primary witness, Roach, indicates that the subsoil investigation was used by Woodward. Roach admitted at trial that he received a copy of the test pile report because Delta Testing, the company which drove the test piles, routinely sent him copies of its reports when Eustis had performed the subsoil investigation. Since Eustis delivered the subsoil report to Nicholson, and since Woodward ordered the test piles, the only way Delta could have known to send a copy of the test pile report to Roach was because Woodward supplied a copy of the subsoil report to Delta.
Since the record contains sufficient evidence to support the trial court's decision on this issue, Eustis' arguments on this issue are without merit.

2. Standard of Care
Eustis' second argument on the liability issue is that neither the plaintiff nor the other defendants proved the standard of care applicable to geotechnical engineers working in the New Orleans area in the early 1970's. None of the expert witnesses presented at trial testified concerning the practice of all the geotechnical engineers working in the area, Eustis claims.
The general standard of care applicable to all professionals, including engineers, is that the services be performed "with the same degree of skill and care exercised by others in the same profession in the same general area." Hogan Exploration v. Monroe Engineering Associates, Inc., 430 So.2d 696, 700 (La.App. 2d Cir. 1983). The plaintiff ordinarily has the burden of proving a breach of the above standard. Id.
However, an exception to the above rule exists under the following circumstances:
... when the conduct of [the professional] may be so unprofessional, so clearly improper, and so manifestly below reasonable standards dictated by ordinary intelligence, as to constitute a prima facie case of either a lack of the degree of skill and care exercised by others in the same general vicinity or failure to reasonably exercise such skill and care.
Id., quoting Favalora v. Aetna Casualty & Surety, Co., 144 So.2d 544 (La.App. 1st Cir.1962). Thus, determination of whether a professional has breached a standard of care is not dependent on expert testimony in those instances when "`lay persons can infer negligence' by applying `a common sense standard.'" M.J. Womack, Inc. v. House of Representatives, 509 So.2d 62, 65 (La.App. 1st Cir.) writs denied 513 So.2d 1208 and 513 So.2d 1211 (La.1987), quoting Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986).
After reviewing the record in the instant case, and for the reasons detailed in the section which follows, we believe that the trial judge could reasonably have concluded that Eustis breached the standard of care applicable to geotechnical engineers in preparing the subsoil report in question. Since the trial judge was not manifestly erroneous in determining that expert testimony on the standard of care practiced by geotechnical engineers in the community was unnecessary because lay persons could infer negligence in preparing the report using a common sense standard, Eustis' arguments on this issue are without merit.

3. Deficiency of the Subsoil Investigation
Eustis' major argument on this point lies with the trial judge's statement, in his reasons for judgment, that Eustis was liable "for preparing a defective subsoil *382 report and piling design." Eustis insists that its report was never intended to be a "piling design," citing testimony from the record and claiming that the company does not design foundations. Nicholson & Loup responds to this argument by accusing Eustis of "engaging in semantics."
We agree with Eustis' argument that the record does not support the trial judge's conclusion that the subsoil report contained a "piling design." Nothing in the record indicates that Eustis had the responsibility for actually designing any part of the building in question. Eustis' responsibilities were limited to investigation of the soil conditions on the site and preparation of a report which adequately informed the design team of any circumstances in the soil which might impact on the design of the building. However, the trial judge certainly was not manifestly erroneous in determining that the report itself was deficient since it failed to fulfill Eustis' responsibilities as outlined above.
Much of the testimony on this issue centered around the following sections of the Eustis subsoil report, which many of the experts characterized as "misleading":
12. Settlement. It is estimated that the settlement of pile supported foundations will be relatively small and should not exceed 0.25 to 0.5 of an inch. This estimate of settlement is based on the assumption that the foundation design will utilize single rows of piles on relatively wide spacings or relatively small pile groups not exceeding 4 or 5 piles per group. It further assumes that piles having a minimum embedment of 50 feet below ground surface will be used to support wall or column loads. If large pile groups on the order of 8 to 10 piles or greater are used, it is recommended that the piles be driven to an embedment of 65 to 70 feet below ground surface. Floor Slab

13. The surface material at the site has sufficient strength to support floor loads on the order of 350 to 400 pounds per sq. ft. However, the underlying very compressible humus and very soft clays containing organic matter will consolidate under a sustained load and it is estimated that settlement on the order of 8 to 12 inches at the center of the floor slab and approximately one-half these values near the edges and corners will occur. Therefore, it is recommended that the floor slab be supported on a driven pile foundation having a minimum embedment of 40 feet. It is estimated that the settlement of the floor slab if supported on 40-ft. long piles may be on the order of 0.5 to 1 inch. If piles 50 feet in length are used to support the floor slab, it is estimated that the settlement may range from 0.25 to 0.5 of an inch.

Fill Material
14. It is recommended that fill material required at the site for grade or for drainage purposes be placed and compacted as soon as possible and as far in advance of construction as possible in order to allow time for consolidation of the underlying humus and very soft clays containing organic matter. It is recommended that the fill be hydraulically dredged river sand, which is available locally, and is excellent for use as structural fill material. This select fill material should be compacted to 100 percent of Standard AASHO dry density of optimum moisture content. In view of the very compressible nature of the nearer surface soils and the compressible nature of the underlying clays, settlements [sic] in parking areas (and any areas subjected to loads which are not pile supported) should be expected. A careful preload operation under controlled conditions (including a designed "overload" and the installation of settlement plates) would minimize these settlements. Such an operation would require several months and Eustis Engineering Company can assist in planning such an operation, if desired. However, even with the preload operation, some smaller long time settlements should be expected in these areas.
Eustis Subsoil Investigation (N & L-5), pages 6-7. (Emphasis added.)
*383 Eustis claims that the above sections are not misleading because the designer should have known from the context that the reference of use of fill in section 13 contemplated only a small amount of fill "for grade or for drainage purposes." Additionally, Eustis argues that it had no responsibility to mention fill because no one informed the company that the designer intended to add a large amount of fill to the property. Eustis would place the responsibility for communicating the intent to use four to six feet of fill on the property on Woodward, saying the design team should have been able to determine from the report that use of a large amount of fill would cause problems. Eustis also cites Blessey's testimony that the report contained sufficient information for designing the building in question.
However, much of the expert testimony presented at trial is contrary to Eustis' position. The expert engineers who testified at trial, other than Eustis' witnesses, were virtually unanimous in concluding that the subsoil report should have addressed the effect of fill on the soils present at the site of the proposed supermarket and that the recommendation of different length piles was inappropriate under the circumstances.
Dr. Acar stated that the Eustis report failed to provide "a concise and mature statement of settlement" or any information about the effect of fill on settlement. The report should have stated concisely that fill may cause a lot of settlement in the pile, Dr. Acar concluded. Additionally, Dr. Acar noted that the report recommended the use of friction piles and failed to include any cautionary statements about the relationship between piles and differential settlement, which should have been noted. A major book used by members of the engineering profession, published sometime in the late 1940's, recognized that varying length friction piles should be used only with great caution, Dr. Acar stated. The use of different length piles with compressible soils like those on the site in question was also inappropriate, according to Dr. Acar.
Dr. Avent testified that the Eustis report was deficient for a report prepared in 1971 from his point of view as a structural engineer partially because of the above-quoted sections. Those sections of the report negated any concern about settlement in pile-supported areas, Dr. Avent stated, and failed to mention settlement problems associated with the use of fill. Additionally, the discussion of fill in section 14 is "vague and misleading," he said. Under the circumstances, the report should have contemplated the use of fill, Dr. Avent stated, or should at least have contained sufficient information to warn the designer that he should get additional information if he intended to use a lot of fill.
Dr. Felicien Perrin, who testified as an expert witness on behalf of the court, focused his testimony on Eustis' responsibility primarily on the report's implication that the use of different length piles was appropriate. That recommendation was inappropriate for the site both because of the known compressible underlying soils and because the site was "known to require much fill to bring it to grade." Perrin also noted inconsistency in the Eustis report, which assumed a minimum tip embedment of 50 feet, then recommended that the floor slab be pile-supported with 40-foot piles. Perrin concluded that the geotechnical engineer knew that fill would compress the underlying soils, and that he should have recommended the consideration of the effects of down drag. Perrin also stated that Eustis should have followed up after receiving the test pile results from Delta Testing.
Case's soil and foundation engineering expert, James R. Gore, stated unequivocally that Eustis' failure to mention down drag in the report, under the circumstances, was a breach of the standards of the profession. Gore noted two other 1970 Eustis soil reports which specifically mentioned down drag, saying those reports prove that Eustis was aware of the effects of down drag on piles. Additionally, Gore stated that section 14 of the report would lull an engineer into thinking that fill under the building was not critical as it was in the parking lot, and concluded that nothing in *384 the report indicated that fill would be detrimental to the piles. Gore also stated that Eustis' decision to bore holes only as deep as the recommended piles was uncommon because soil engineers should know about the properties of the soil five to ten feet below the tips. Finally, Gore stated that different pile lengths should not be recommended when drag load might be critical. He said that he routinely visited the sites when he prepared soil reports, partially to determine whether fill might be needed, although that was not the primary reason. Case's other expert civil engineer, David A. Hunter Jr., stated that the Eustis report implies that placement of fill in the pile-supported areas is acceptable.
Certainly the record also contains testimony indicating that the Eustis report was sufficient to meet Eustis' responsibility to inform the design team of any circumstances in the soil on the site which might impact on the design of the building. However, the trial judge obviously accepted the testimony detailed above over the testimony of Eustis' witnesses that the report was not deficient. "Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible." Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106, 1111 (La.1990). Additionally, when a trial court's findings are "based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 845 (La.1989).
Since the trial judge's conclusion that the Eustis report was deficient was based on a decision to credit the above testimony over the testimony of Eustis' witnesses, it cannot be considered manifestly erroneous or clearly wrong. Thus, Eustis' arguments on this issue are without merit. The trial court judgment holding Eustis liable for the plaintiff's damages is therefore affirmed.

B. Liability of Carl E. Woodward, Inc.

Woodward appeals the trial court decision holding it liable for the plaintiff's damages, making two basic arguments: (1) the trial court improperly failed to specify that plaintiff's damages were caused by the deficient design of the building, not by deficiencies in construction; and (2) evidence on deficiencies in Woodward's design was improperly admitted by the trial court because the plaintiff failed to sue Woodward in its design capacity.
1. Woodward's Liability for Construction Defects
In addressing Woodward's liability for plaintiff's damages in his written reasons for judgment, the trial court stated as follows:
The building contract required the contractor, Carl Woodward, Inc.[,] to both design and build the structure. (N & L Exh. 6) Woodward, Inc. retained an in-house Architect, Larry Case, whose name also appears on the contract, to prepare the plans and specifications. The Court is of the opinion that the defendants breached the contract with the plaintiff.
Woodward filed a Motion to Amend Judgment and For a New Trial, requesting the trial court to clarify its judgment and state specifically that Woodward's liability was based solely on design defects, rather than construction defects; that motion was denied. Woodward and Employers claim that the distinction is important for determining who pays Woodward's portion of the judgment because Employers is responsible for construction defects, while Woodward itself is liable for design defects, although it is entitled to indemnification from its architect's errors and omissions insurer concerning architectural deficiencies.
After reviewing the record, we find no evidence of any construction defects. All the experts who testified stated unequivocally in response to questions from counsel for Employers that they saw no evidence that the building was not built in accordance with the plans and specifications. Therefore, we amend the judgment to clarify *385 that Woodward's liability arises only from design defects.[1]
2. Woodward's Liability for Design Defects
Woodward and Employers also challenge the trial court judgment holding Woodward liable for design defects on the basis of the following arguments: (1) the trial judge improperly allowed admission of evidence on this issue because the plaintiff did not sue Woodward in its design capacity and the pleadings were never formally amended and (2) no evidence was presented to prove that Woodward's design fell below standard.

a. Admission of Evidence on Design Defects
In its original petition, Nicholson & Loup simply named Carl E. Woodward, Inc. as a defendant, then alleged as follows:
IV.
On June 23, 1972, Petitioner, as owner, entered into a building contract with Carl E. Woodward, Inc., as contractor, for the erection of a supermarket....
VI.
Defendants, Larry H. Case and Eustis Engineering Company, as the architect and engineers who designed, planned and recommended the buildings and improvements above referred, as well as soil preparations, construction practices, etc.
. . . . .
XIV.
Said defects were caused by improper planning and/or construction of the above referred improvements.
XV.
Petitioner alleges that Defendants, Carl E. Woodward, Inc., as contractor, Eustis Engineering Company, as engineers, Employers Commercial Union Insurance Company, as surety, and Larry H. Case, as architect, are liable in the proportions above stated for damages....
(Emphasis added.)
Woodward claims that the above portions of the petition restrict its liability for construction defects because Nicholson & Loup consistently referred to Woodward as "contractor" in the petition. In pursuit of this theory, Woodward consistently objected to any evidence regarding defects in its design of the building. The trial judge consistently overruled the objections. Woodward claims that the trial judge improperly allowed an "amendment to the pleadings" under La.C.C.P. art. 1154. Woodward does not allege that it was not responsible for the design of the building under the contract with Nicholson & Loup.
La.C.C.P. art. 865 provides the general principle that pleadings are to be "construed as to do substantial justice." The Louisiana Supreme Court has recently interpreted that provision to require that pleadings be construed "to afford litigants their day in court, to arrive at truth, and to do substantial justice." Kuebler v. Martin, 578 So.2d 113, 114 (La.1991). Additionally, "pleadings are to be construed in the light of their allegations as a whole and not in view of a detached sentence or paragraph therein standing alone." Mid-City Investment Co. v. Young, 238 So.2d 780, 784 (La.App. 1st Cir.1970). Pleadings are to be construed liberally since technical rules of pleading no longer apply in Louisiana courts; thus, any doubt concerning the meaning of a pleading must be resolved in favor of the pleader in order to do substantial justice. Boudreaux v. Allstate Finance Corp., 217 So.2d 439, 444 (La.App. 1st Cir.1968). From these statements, the following principle has been derived:
When the pleading in question is construed in its entirety and with all other matters occurring during trial which relate *386 to the pleading, and it is more reasonable than not to conclude that the adverse party received fair notice and was fairly informed of the pleading's intended substantive result and procedure by which that result was intended to be accomplished, the pleading will be held to be legally effective and to satisfy the requirements of the Code of Civil Procedure which are raised in objection to the pleading.
Townsend v. Cleve Heyl Chevrolet-Buick, Inc., 318 So.2d 618, 623 (La.App. 2d Cir. 1975).
In the instant case, the trial court was not manifestly erroneous in determining that the petition in question was sufficient to give Woodward fair notice that Nicholson & Loup sought damages for both construction and design defects. The fact that Woodward was specifically sued as contractor cannot be singled out to avoid liability for design defects. The petition as a whole indicates that the plaintiff sought to hold the defendants liable for all of their negligent acts which resulted in damages. Reading the petition liberally in the light most likely to result in substantial justice required that the trial court accept evidence concerning Woodward's negligent design of the building. Thus, Woodward and Employers arguments on this issue are without merit.

b. Evidence of Negligent Design
The second argument advanced by Woodward and Employers on the liability issue centers around the sufficiency of the evidence presented at trial to prove that Woodward's design was in fact defective. Woodward argues essentially that the Eustis soil report was so defective that it was impossible for the structural engineer to properly design the building. Any deficiencies in the design of the building resulted either from improper statements or omissions in the Eustis report, Woodward claims, and thus cannot be attributed to Woodward.
However, the record reveals sufficient evidence on which the trial judge could have determined that Woodward negligently designed the building in question. Dr. Acar testified that the structural engineer should have contacted the geotechnical engineer for advice before starting to build, especially since Woodward planned to add a lot of fill to the site. Additionally, Dr. Acar stated that the structural engineer should have been on notice that down drag could be a problem under the conditions present at the site of the proposed supermarket.
Dr. Avent agreed with Dr. Acar on this issue, saying that the designer should have contacted the geotechnical people if he planned to use a "significant amount of fill." Dr. Avent stated that the design people should communicate with the geotechnical people especially concerning "any variation ... not spelled out" or if the structural engineer found anything in the soil report that he thought was vague. Additionally, Dr. Avent discussed the fact that the pilings used on the site did not have a minimum tip embedment of 40 feet, as recommended by the Eustis report, because the presence of the fill caused the pile embedment to be four feet short of the recommended depth. Nothing indicates that the designer made any adjustments in consideration of the presence of the fill, Dr. Avent said.
Woodward's failure to communicate its intention to use four to six feet of fill was also discussed by Roach, who signed the Eustis report. Roach stated that no one from Woodward ever called him and nothing in the job file indicated the amount of fill. He would have included additional information in the report had he known about the presence of the fill, Roach said, or he would have contacted the structural engineer to tell him about the possible problems with down drag if he had learned about the fill after completing the report. Roach said that he would have offered the structural engineer alternatives and asked him to wait until he got a supplemental report if he had been informed about the fill.
Samuel P. Landry, a licensed civil engineer who testified on behalf of Eustis, said that Woodward's decision to drive the tips *387 of the piles short of the penetration specified in the Eustis report could have caused a reduction in the capacity of the piles, which might have contributed to the settlement. Additionally, Landry noted that it was uncommon to use four to six feet of fill at the time and that he did not typically receive soil reports which anticipated use of more than one or two feet of fill.
Landry also noted other design defects. The specifications for the project called for 95 percent maximum density fill, which was not in accordance with the Eustis report, he noted. Moreover, batture sand, which is different from the hydraulically dredged river sand specified in the Eustis report, was used. The Eustis report also recommended a pre-load operation with a designed overload to determine when rapid settlement had leveled, which was never conducted. Additionally, Landry stated, the design team did not use the efficiency formula recommended by Eustis. Finally, the plans and specifications revealed at least two departures from the Jefferson Parish Building Code: (1) The designer figured 50 pounds live load rather than the 75 pounds required by the code, and (2) the designer failed to consider wind load or loads imposed by the fill material, as required by the code.
Eustis' expert witness, Blessey, stated that structural engineers should have a working knowledge of soil mechanics and that engineers working in the area knew that high fill was a "no no" in New Orleans. Additionally, Blessey said, methods for elevating buildings without the use of fill are available, but they require skill and experience. Blessey also noted the six "departures" from the Eustis report detailed earlier. Engineers did not ordinarily use fill at the time this building was planned simply because they were aware of the potential problems, Blessey stated.
On the communication issue, Perrin, the expert who testified on behalf of the court, noted that the Eustis report told the structural engineer to contact Eustis to develop an operation plan for pre-loading, which was never done. Perrin stated unequivocally that neither the geotechnical engineer nor the structural engineer fulfilled his obligation to communicate with the other.
As was the case with Eustis, the record also contains testimony that indicates that Woodward's design was appropriate considering the information supplied by the Eustis report. However, since Sistler and Rosell establish that a trial court's decision to credit the testimony of one expert or set of experts over another can never be manifestly erroneous, Woodward's arguments on this issue are meritless. The record contains ample evidence to support the trial court's judgment.
The trial court judgment holding Woodward liable for the damage to the Nicholson & Loup store based on defects in the design of the building is therefore affirmed.
C. Liability of Case
Defendant Case contests the trial court judgment holding him liable for plaintiff's damages, making two basic arguments: (1) that the record contains no evidence that he was responsible for the defective foundation design, and (2) that the plaintiffs failed to present expert testimony to establish the standard of care of an architect.

1. Case's Responsibility for Foundation Design
In finding defendant/architect Case solidarily liable with the other defendants for the plaintiff's damages, the trial court stated as follows:
The building contract required the contractor, Carl Woodward, Inc. to both design and build the structure. Woodward, Inc. retained an in-house Architect, Larry Case, whose name also appears on the contract, to prepare the plans and specifications. The Court is of the opinion that the defendants breached the contract with the plaintiff.
In appealing this finding, Case claims that the record contains no evidence indicating that he assumed any primary or vicarious responsibility for the selection of the piles or the design of the foundation at the Nicholson & Loup store. However, after reviewing the record, we find that the trial *388 court was not manifestly erroneous under the circumstances in finding that Case was liable for the damages suffered by Nicholson & Loup.
The only testimony on this issue presented at trial was that given by Case and LeGardeur. Both stated unequivocally that Case was not involved either with the design of the foundation of the building or with the selection of piles.
Case testified that his job was to design the "envelope" for the building, meaning that he was responsible for laying out the building within the parameters set by the owner; the "envelope" literally involves design of the interior space and design of the exterior facade of the building. Case said that he did the layout for the preliminary plans for the building, including the structural system and the column base spacing. Additionally, Case testified, he worked on the decor of the interior, as well as the location for the partition.
Case insisted that his work on the project was limited to architectural services. Had the contract been a simple architectural agreement, rather than a "design/build" contract, the owner would have had to employ separate electrical, plumbing, and structural engineers, Case stated. However, since Nicholson & Loup's contract with Woodward was a "design/build" contract, which made Woodward responsible for the project from design to construction, Woodward assumed the responsibility for providing the necessary engineers; he personally was not involved with selecting engineers, Case stated. Case reiterated several times that he had no input on the structural design or the selection of piles or pile lengths.
However, Case admitted at trial that the specifications did give him some responsibility for assuring that things were done correctly and that all materials, workmanship, design, and arrangement of materials were subject to his approval. Case also admitted that he set the elevation of the building and that he counted the piles to be sure the number called for in the specifications was used.
Additionally, Case's architectural seal appears on the first thirteen pages of the plans and specifications. Those pages are marked with an "A," apparently indicating that those pages were the architectural plans. Case's seal does not appear on the pages marked with an "F" (apparently indicating foundation plans), the pages marked with an "E" (apparently indicating electrical plans), or the pages marked with "M & P" (apparently indicating mechanical and plumbing plans).
Although Case's seal does not appear on all the pages of the plans and specifications, the following notation does appear on the first page of the documents:
These plans and specifications have been prepared by or under (my our) close personal supervision and to the best of (my our) knowledge and belief; [sic] they comply with all city requirements, that I am (supervising not supervising) the work.
In the notation on the documents, the word "our" has been deleted in the first two parentheticals, and the words "not supervising" have been deleted in the third parenthetical. The above notation is followed by Case's signature and his seal.
That notation, which does not limit its effect to the architectural plans, unequivocally indicates that Case assumed responsibility for all the documents in the packet, including the foundation plans, the electrical plans, and the mechanical and plumbing plans. LSA-R.S. 37:152(B) expressly prohibits an architect from affixing his seal, stamp, or permit to any document "not prepared either by him or under his responsible supervision."
The design/build agreement between Nicholson & Loup and Woodward also indicates that Case is responsible for all of the plans and specifications. Article 3 of the contract provides as follows:
The Architect for this project is Larry H. Case, A.I.A. Cost of plans, specifications[,] and drawings and all architect's fees due Larry H. Case, A.I.A., [sic] are included in the lump sum contract price.
This article provides that all the plans, specifications, and drawings, as well as all *389 architect fees, are to be paid out of the same fund. Additionally, it is significant that Case is the only professional specifically named in the contract; the contract does not provide for any engineers.
Finally, the specifications for the Nicholson & Loup project place numerous responsibilities regarding the foundation of the building on Case. A close review of the specifications reveals numerous instances where the architect's approval is required and other instances where the architect is required to make certain decisions.
Given the circumstances presented by this case, we find that the trial judge was not manifestly erroneous in concluding that Case was responsible for the defective foundation in the plaintiff's store and holding Case liable for the plaintiff's damages.

2. Evidence on the Standard of Care
Both Case's original brief and reply brief refer to the plaintiff's failure to present expert testimony on the standard of care applicable to architects practicing in the New Orleans area at the time the Nicholson & Loup store was designed.
The same exception to the general rule requiring expert testimony concerning the standard of care which applied to Eustis also applies to Case. That exception arises when lay persons, applying a common sense standard, can infer negligence. M.J. Womack, Inc., 509 So.2d at 65. As discussed above, the trial court was not manifestly erroneous in concluding that Case was responsible for preparation of the foundation plans for the plaintiff's store. Obviously, those plans were deficient under the circumstances. Thus, Case's negligence can be inferred by lay persons using a common sense standard. The trial court judgment holding Case liable for the plaintiff's damages is thus affirmed.

D. Liability of Employers

Both Woodward and Employers contest the trial court judgment holding Employers liable for plaintiff's damages, claiming that the bond agreement between Woodward and Employers was intended to cover only construction defects, not design defects. Since the record contains no evidence of construction defects, the defendants claim Employers has no liability.
The trial court judgment regarding the liability of Employers states as follows:
With regard to defendant Employers Commercial Union Ins. Co., the Court finds that it is liable to the plaintiff as surety for the amount it guaranteed under the surety bond. The surety contract was broad enough to cover Woodward's contract with Nicholson & Loup.
The suretyship contract is captioned "Bond for Public WorkLouisiana." It provides, in pertinent part, as follows:
That Carl E. Woodward, Inc.[,] as Principal, and Employers Commercial Union Insurance Company [,] authorized to and doing a surety business in the State of Louisiana, as Surety, are held and firmly bound unto Nicholson & Loup, Inc.[,] as Obligee, and the beneficiaries thereof under R.S. 38:2241 through R.S. 38:2248, of the General Assembly of Louisiana as amended, in the full and just sum of Nine Hundred Twenty Nine Thousand, Three Hundred Seven and No/100 Dollars, ($929,307.000)....

. . . . .
WHEREAS, The Principal has entered into a certain written contract dated the 23 day of June 1972, with the Obligee for Construction of a one story Supermarket and Service Station Building located 2020 Belle Chasse Highway, Belle Meade, Louisiana, which contract is hereto attached and made a part hereof.
NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH That if the above bounden Principal shall faithfully perform said contract according to its terms, covenants and conditions, and shall pay all statutory beneficiaries of this bond as their interests may arise, then this obligation shall be null and void; otherwise to remain in full force and effect.
Although the above contract does not expressly limit the surety's liability to construction defects, Employers and Woodward *390 claim that the referenced statutes, LSA-R.S. 38:2241-38:2248 encompass "only construction and repair of structures, not design." Additionally, both Employers and Woodward admit that the suretyship contract was executed on the wrong form, that a private works bond should have been used. Furthermore, the defendants claim, the statutes governing private works bonds, LSA-R.S. 9:4801 et seq., apply only to construction and repair, not to design defects.
Neither Employers nor Woodward cite any authority for the proposition that the statutes in question apply only to construction and repair, and nothing in the statutes or the annotations following those statutes establishes that principle. In fact, the jurisprudence on the issue indicates that contractor suretyship bonds are designed to secure performance of the contract referenced therein. In the instant case, the contract referenced in the surety agreement was a design/build contract.
Generally, a suretyship contract is an accessory promise by which the surety binds himself to fulfill the obligations of the principal, should the principal fail to perform. LSA-C.C. art. 3035. A suretyship contract binds the surety to satisfy the principal's entire obligation, unless the contract is limited. Bossier Medical Properties v. Abbot and Williams Construction Company of Louisiana, Inc., 557 So.2d 1131, 1133 (La.App. 2d Cir. 1990). A contractor's surety bond may be one of three types: (1) one guaranteeing that the contractor will perform the contract, (2) one guaranteeing payments of all bills for labor and materials contracted for and used by the contractor, or (3) one guaranteeing both of the above. Id. While a public works bond is subject to all statutory requirements, a private works bond is purely a conventional obligation, which must be interpreted by the terms of the contract itself. Jimco, Inc. v. Gentilly Terrace Apartments, Inc., 230 So.2d 281, 283-84 (La.App. 4th Cir.1970). Moreover, a suretyship contract must be strictly construed in favor of protecting the obligee. Id.
The suretyship bond at issue in this case guarantees both the contractor's performance of his obligations under the original contract and the payment of all bills. Although the material filled in the blank on the bond form refers to construction of the supermarket and service station, the boilerplate language in the form refers to the contract twice. Since the suretyship contract must be strictly construed in favor of Nicholson & Loup, the trial court properly applied the surety agreement to the entire design/build contract. Since the contract covered by the accessory promise placed both design and build responsibilities on the principal, the surety contract, when interpreted strictly, must be construed to cover both aspects of the project. We find that the trial judge was not manifestly erroneous in determining that the surety contract at issue was broad enough to cover Woodward's design responsibilities under the contract between Woodward and Nicholson & Loup. Thus, the trial court judgment applying the Employers bond to the plaintiff's damages is affirmed.
E. Conclusion on Liability Issues
For the reasons explained hereinabove, the trial court decision holding Eustis, Woodward, and Case liable for the damages suffered by Nicholson & Loup is affirmed. Furthermore, the trial court decision casting Employers in judgment is also affirmed.

III. DAMAGES
All of the defendants contest the damages awarded by the trial court to compensate the plaintiff for its damages occasioned by the defective foundation, making the following arguments: (1) the trial judge improperly found that the building could not be repaired, and would have to be demolished; (2) the trial judge applied an incorrect measure of damages; (3) the trial judge improperly ruled that interest should begin on the date of judicial demand; and (4) the trial judge improperly taxed all expert witness fees to the defendants. The plaintiff also appealed on this issue, arguing *391 that the damage award was insufficient to compensate it for all its losses.

A. Repair v. Demolition

In determining that the supermarket in question could not be repaired and would have to be demolished, the trial judge stated in his reasons for judgment as follows:
After considering the expert testimony presented by the defendants on repair of the structure, the Court finds that the supermarket cannot be adequately repaired, and therefore finds that the building must be rebuilt. The Court was permitted by all counsel to inspect the building and was impressed with the ruin and dangerously substandard quality of the building. For Nicholson and Loup to use the property, even with the proposed floor repairs, would be an invitation to litigation.
The defendants contest this factual finding, saying the testimony presented at trial indicated that the supermarket floor could easily be repaired at a reasonable cost.
Since the determination that the floor in question cannot be repaired is a factual finding, it is subject to the manifest error standard. This court may not reverse that finding unless it determines that it is not supported by the evidence presented at trial. Additionally, the trial court's decision to credit the testimony of one expert or set of experts over another can never be manifestly erroneous under Rosell and Sistler.
David A. Hunter Jr., who testified as an expert civil engineer for Case, suggested three different repair schemes: (1) topping the existing slab with a lightweight material; (2) removing the fill material from beneath the slab through holes cut in the slab for that purpose; and (3) removing and replacing the interior portions of the slab, leaving the perimeter areas, which have not settled as much as the interior.
The trial court's decision that none of these repair schemes is feasible is supported by competent expert testimony. For example, Dr. Avent, the plaintiff's structural engineering expert testified unequivocally that the strength of the supermarket building has been so compromised as to make the building unacceptable. Dr. Avent stated that his investigation led him to conclude that the slab in the building has failed. If significant weight were added in a repair scheme, Dr. Avent said, the piles could fail, causing a "significant movement" since overloading the pile could result in partial collapse of the structure. Dr. Avent said that he would not recommend any repair scheme which would add any additional weight to the floor. He recommended that the supermarket be demolished and rebuilt.
In response to questions from Case's attorney, Dr. Avent admitted that jacking up the floor, removing fill, and replacing the slab with epoxy might be a feasible repair approach, but stated that it would be very costly and very difficult to accomplish. "Things" do not easily return to their original place when jacked up, Dr. Avent said.
Dr. Avent's testimony was somewhat corroborated by Landry, Eustis' expert engineer, who said that some of the pilings in the Nicholson & Loup building were already below the factor of safety of 2.0 required by the Jefferson Parish Building Code. Landry said that no additional weight could be added to the pilings without violating the Code. Eustis' other expert, Blessey, also stated that some of the piles in the mezzanine area of the store are overloaded and admitted the existence of a "possible danger" of the floor "dropping down."
The court-appointed expert, Perrin, referred to problems with all of the proposed repair schemes, stating that he could not endorse jacking the existing slab or removing the fill beneath the slab. He stated that the entire slab should be "replaced after redesign."
In response to questions from plaintiff's counsel, even Case's expert, Hunter, who proposed the three repair schemes, admitted possible problems with those plans. If the cost of repairs to a building is more than 50 percent of the current value of the building, the Jefferson Parish Code requires *392 that the entire building, not just the repaired portion, conform to the current codal requirements. The code requires that building elevations be six inches higher than the highway the building faces. Hunter admitted that it would be impossible to jack up the slab in the plaintiff's building to the extent necessary to meet that requirement, under any of the repair schemes. Furthermore, the current code requires that all electrical wiring be copper, rather than aluminum; therefore, all of the electric lines would have to be replaced to meet the requirements of the current code.
Certainly many of the defendants' experts testified that the building in question could feasibly be repaired without damage to the building. However, since the trial court's decision is supported by the evidence detailed above, it is not manifestly erroneous. Therefore, the trial court finding that the building slab cannot be repaired is affirmed.

B. Measure of Damages

The trial court judgment awarded the plaintiff the following damages against Woodward, Case, Eustis, and Employers: $3,236,136 to rebuild the structure, plus $240,000 for one year of damages for economic loss, minus a credit for use of $937,500 ($62,500 per year for 15 years), for a total of $2,538,636. The defendants appeal the damage award, arguing that the trial court improperly awarded the plaintiff the cost of rebuilding the supermarket. The plaintiff also appeals on this issue, arguing that it is entitled to more than one year of economic losses and that the trial judge improperly applied the credit for use.

1. Cost of New Construction
The defendants argue strenuously that the trial court erred in awarding the plaintiff damages to rebuild the supermarket in question, even if the building does have to be demolished. The plaintiff counters that argument, citing the general rule that trial courts have much discretion in setting damages when they are "insusceptible of precise measurement." La.C.C. art. 1999.
The following civil code articles and the jurisprudence interpreting those articles control this issue:
If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks.
La.C.C. art. 2762.
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from the non-compliance with his contract.
La.C.C. art. 2769.
The general rule for measuring damages occasioned by a defective building is that the owner is entitled to "the cost of repairs necessary to convert the unsound structure to a sound one or the amount paid to remedy the defect." Manzanares v. American International Forest Products, Inc., 389 So.2d 1142, 1146 (La.App. 3d Cir.1980). However, every circuit court in this state applies the following exception to that rule when the construction is so defective as to be considered useless:
Under Louisiana law, if the defects are such that they cannot be corrected except by removing and replacing the construction, the owner may require the contractor to remove the object from his land and restore the premises to its prior condition. Additionally, the owner is entitled to damages.
Hebert v. McDaniel, 479 So.2d 1029, 1033 (La.App. 3d Cir.1985). See also Crescent Coating Co., Inc. v. Berghman, 480 So.2d 1013, 1019 (La.App. 5th Cir.1985); Sledge v. Aluminum Specialties Manufacturing, Inc., 351 So.2d 835, 837 (La.App. 1st Cir. 1977); Toepfer v. Thionville, 299 So.2d 415, 418 (La.App. 4th Cir.1974); U-Test-M of Louisiana, Inc. v. Martin, 305 So.2d 557, 559 (La.App. 2d Cir.1974).
*393 The above exception is derived from the following language from the Louisiana Supreme Court's decision in Ilgenfritz v. Radalec, Inc., 226 La. 59, 74 So.2d 903 (1954):
The standard measure of damages is established by the Code as the losses ensuing from non-compliance. It is shown in this case that the losses sustained is [sic] the payment for a useless heating system, and the cost of restoring plaintiffs' home to its former condition. These are all losses under the contract. Defendant is liable for those losses. In fact, there should be compensation up to and to the extent for the losses actually sustained in this case amount to restoration of the status quo.
Id. 74 So.2d at 906-07.
The plaintiff argues that under the general rule, giving the trial court great discretion in setting damages, the trial judge was not bound by the exception stated above and could properly award the cost of a new construction. However, the plaintiff has not cited any cases where the court allowed the cost of new construction as the measure of damages in a similar case. Furthermore, the jurisprudence contradicts this argument. In Crescent Coating Co., 480 So.2d at 1019, the court found that the trial judge was manifestly erroneous in fixing damages at the cost of a new construction. See also U-Test-M, 305 So.2d 557. In both of those cases, the appellate court believed that the trial court's calculation of damages placed the plaintiff in a better position than he would have occupied had the contract been properly performed. In the instant case, the trial court judgment has the same result. Thus, the trial court was manifestly erroneous in awarding the plaintiff the cost of a new construction.
The trial judge stated that he was "impressed with the uncontroverted testimony of plaintiff's construction expert, Mark Dahlman," and adopted Dahlman's figures for rebuilding the supermarket. Dahlman set the cost of demolishing the existing structure at $355,950; that is the only figure calculated by Dahlman which the plaintiff is entitled to recover. The plaintiff is also entitled to recover the $929,307 contract price paid to Woodward and the $1,281.50 contract price paid to Eustis.
For the above and foregoing reasons, the trial court judgment is amended to remove the award for construction of a new building and to award the plaintiff the following costs:

Cost of demolishing the existing structure $ 355,950.00
Contract price paid to Woodward 929,307.00
Contract price paid to Eustis 1,281.50
 ______________
TOTAL $ 1,286,618.50

2. Other Damages

The trial court awarded the plaintiff $240,000 for one year of "damages for economic losses," then applied a $937,500 credit for use, calculated as $62,500 per year for the 15 years the store was open. The defendants claim that the trial court should not have allowed any damages for economic losses or for lost rentals, while the plaintiff contends that the trial court should not have applied a credit for use. The plaintiff also seeks an increase in the economic losses award, saying it is entitled to more than one year of those losses.
The trial court judge explained the economic loss award in its reasons for judgment as follows:
With regard to the damages for economic loss, the Court finds that there was not sufficient proof to award damages for loss of profits. However, the Court finds that the testimony given by plaintiff's expert, Mr. Jack Stumpf, who is a commercial real estate expert, supports *394 a finding of a fair rental value of $240,000 per year for a 10 year lease. Since the plaintiff did not close the store until March of 1989, the Court awards the plaintiff the sum of $240,000 per year for one year.
The plaintiff appealed, claiming that the trial court should have awarded damages for more than one year of economic damages and that the trial court should not have applied a credit for use. The defendants claim the plaintiff is not entitled to any economic losses because Nicholson & Loup failed to prove any economic losses caused by the condition of the supermarket floor; the defendants also argue that the trial court's decision to apply a credit for use was proper.
The plaintiff concedes that fair rental value is a "much more direct and logical analysis of economic loss" than lost profits because "economic loss is [usually] difficult to assess because many forces act upon the business in addition to defective construction." However, the plaintiff alleges, the trial court should have allowed more than one year of lost rentals because "even the trial court found the building to be in a state of ruin and dangerously substandard at least two years prior to the judgment." The plaintiff claims that it should have been awarded $2,400,000 for the loss of a 10-year lease. Nicholson & Loup claims that the trial court's decision to use the closing date of the supermarket as the beginning date for the award of economic losses is improper because the evidence clearly demonstrated that the store lost money for many years prior to the closing. Thus, the plaintiff essentially argues inconsistently that it is entitled to an award for lost profits from the time the store started losing money, even though the measure of the damages should be $240,000, the fair rental damages. Furthermore, Nicholson & Loup argues, the award should continue beyond the date of the judgment because the defendants have made no provisions for paying the judgment.

a. Lost Profits
At trial, Nicholson testified that the Belle Meade store began losing money in 1981. That testimony was corroborated by the testimony of George Panzeca Jr., senior manager and director of the public accounting firm of Ernst & Whinney. However, that evidence was substantially mitigated by evidence that the lost profits were affected by several factors other than the condition of the floor slab. Nicholson himself testified that the profits at the store "dropped" because "the floor sank and the oil business went bad." Moreover, Nicholson testified that seven major supermarkets opened within one or two miles of the Nicholson & Loup Belle Meade store during the late 1970's and early 1980's. Nicholson acknowledged the fact that increased competition plus the fact that many families moved out of the area affected the lost profits. Additionally, Nicholson admitted that his Marrero store was boycotted for political reasons during that period, but insisted that the boycott only lasted a couple of days and did not affect the Belle Meade store.
Panzeca also testified that all three of the Nicholson & Loup stores began losing money about the same time, a fact which indicates that the condition of the floor at the Belle Meade store was perhaps not responsible for the lost profits. Nicholson insisted however that the profits went back up at the other two stores, but did not go back up at the Belle Meade store because of the floor.
Moreover, Nicholson testified under cross-examination concerning a report prepared by Lewis Grocery, a wholesale grocery distributor, which indicated that the primary reason for the loss of profits was "a sale base insufficient to support its fixed expenses." The report rated the store last in 12 of 18 categories, Nicholson said, and made numerous recommendations for improving the store. The Lewis Grocery report was very critical of the store in other areas, but did not mention the condition of the store, Nicholson admitted.
Under the circumstances, we believe that the trial court correctly concluded that the plaintiff failed to prove lost profits.

*395 b. Lost Rentals

Nicholson testified that he considered renting the store a couple of times and stated that the problems with the floor "killed" the second lease deal. He stated that Malone & Hyde offered the company $240,000 per year net lease for a 10-year lease with two five-year options, and that the "same thing" happened with A & P. However, on cross-examination, he conceded that the prospective lessors were not offering enough money for the fixtures, but insisted that one reason the lease deal fell through was the condition of the floor. He said the other party did not try to negotiate the price down because of the floor. Other evidence concerning potential lease deals was presented by real estate broker John F. Stumpf, real estate agent and business broker Ralph Koerner, and Malone & Hyde division president John Moll.
A close reading of all the testimony concerning the prospective lease of the Nicholson & Loup Belle Meade store reveals that no firm offer to lease the store was even made, although negotiation and consideration of a lease arrangement occurred on at least one, perhaps two, occasions. However, the evidence is clear that the reason the deal fell through was the plaintiff's failure to follow up on negotiations concerning the lease of equipment. Although some evidence was presented that any lease of the store would be contingent on repair of the floor, the record reveals that none of the negotiations reached that issue. Since damages may not be speculative, the plaintiff is not entitled to recover lost rentals.
Since the plaintiff failed in its burden of proving either that the lost profits experienced by the store were directly attributable to the condition of the floor, or that the inability to lease the building was caused by the floor, the plaintiffs are not entitled to recover any economic losses from the defendants. The trial court decision to the contrary is therefore manifestly erroneous.
For the above and foregoing reasons, the trial court judgment is amended to delete the $240,000 award to the plaintiff for economic losses.

3. Credit for Use
The plaintiff contests the trial court decision applying a $62,500 credit for use for the 15 years the store was open. Although plaintiff makes several arguments on this issue, we pretermit discussion of those contentions because we find merit in the plaintiff's position on the basis of other grounds.
The only defendant addressing this issue in its appellee brief is Employers. Employers concedes that the trial court offered no rationale for applying a credit for use, but surmises that the trial court was attempting to balance its decision to award judicial interest from the date of judicial demand. Employers claims that there is no basis for either award, then implies that the credit for use was nonetheless proper, while the award of interest from date of judicial demand was obviously improper. We decline Employers invitation to adopt such illogical reasoning. We believe that the judgment should be amended to delete the credit for use for the reasons which follow.
First, we can find no authority for applying a credit for use to reduce the plaintiff's recovery under the rule limiting the plaintiff's recovery in a case involving a construction so defective that it is considered useless. The cases cited in the section concerning the measure of damages do not address the credit for use issue. We recognize the fact that none of those cases involved a construction that the plaintiff was able to use for 15 years, but nonetheless believe that it is inappropriate to apply a credit for use under the circumstances.[2] *396 Second, as Employers concedes, the record is absolutely devoid of evidence concerning the fair value of use of the store. Nothing in the record supports the trial court's decision to value that use at $62,500 per year. In the absence of evidence to determine the value of the plaintiff's use of the building, the trial court was manifestly erroneous in applying a credit for use.
Finally, we believe that the trial court's decision to apply the credit for use was more likely an attempt to offset the award of a totally new supermarket than an attempt to offset the award for interest from the date of judicial demand. Since the trial court awarded the plaintiff the cost of rebuilding the store, he perhaps felt compelled to offset that award, which obviously placed the plaintiff in a better position than it would have occupied had the defendants properly performed their contracts, with a credit, reflecting the fact that the plaintiff would have had a 20-year-old building had the defendants performed correctly. Since we have deleted the award for cost of a new building, we think it appropriate to delete the credit for use award in favor of the defendants.
For the above and foregoing reasons, the trial court judgment is amended to delete the $937,500 credit for use.

C. Commencement of Interest

The defendants appeal the trial court decision awarding interest from the date of judicial demand to the plaintiff, citing the general rule established by La. C.C. art. 2000 that interest begins to run "from the time it is due," which the defendants claim is the time the damages became liquidated on the date of judgment. Plaintiff cites the exception to that rule established by LSA-R.S. 13:4203 that interest on judgments "sounding in damages, `ex delicto'," begins to run on the date of judicial demand.
The jurisprudence is clear that determination of the commencement of interest depends on whether the suit is characterized as "ex delicto" or "ex contractu." See Calhoun v. Louisiana Materials Co., 206 So.2d 147, 151-52 (La.App. 4th Cir.), writ refused 251 La. 1050, 208 So.2d 324 (1968). Thus, the determination of whether the trial judge properly awarded interest from the date of judicial demand depends on the characterization of this case.
The plaintiff cites numerous cases in which suits brought pursuant to construction contracts are referred to as "tort" actions and numerous other construction contract cases where the court awarded interest from the date of judicial demand. However, reference to those cases is unnecessary because this case can be characterized by reference to the definitions of "ex delicto" and "ex contractu" in Black's Law Dictionary, both of which include the following notation:
Where cause of action arises from breach of a promise set forth in contract, the action is "ex contractu", [sic] but where it arises from a breach of duty growing out of contract, it is "ex delicto". [sic]
Id. at 566 & 567 (6th ed. 1990). (Citations omitted.)
The above distinction has not previously been adopted by Louisiana courts; however, the cases cited by the plaintiff reveal that courts routinely impose interest from the date of judicial demand in cases based on the "breach of a duty growing out of contract." Thus, the distinction expressed in Black's Law Dictionary has been tacitly adopted by Louisiana courts. We expressly adopt that distinction now and apply it to the facts of the instant case.
The contract in question here contains no promises concerning the quality of the work, thus the cause of action in this case is not based on "breach of a promise set forth in contract" and it thus is not an obligation "ex contractu." The cause of action in this case is based on the duty to perform the construction in a workmanlike manner, which is imposed by La.C.C. arts. 2762 and 2769 and the jurisprudence interpreting those provisions. Since the cause *397 of action is based on a "breach of duty growing out of contract, it is "ex delicto." Under the provisions of LSA-R.S. 13:4203, the trial judge was required to impose interest from the date of judicial demand because the judgment was "ex delicto." LSA-R.S. 13:4203.
For the above and foregoing reasons, the trial court judgment imposing interest from the date of judicial demand is affirmed.

D. Expert Witness Fees

Eustis contests the trial court's decision to tax the expert witness fees against the defendants, saying simply that "[c]ertainly the costs of the appellants' respective expert witnesses are to be borne by the parties who retained them," and that expert witness fees are "not proper items of court costs for which appellants are to be taxed." Eustis provides no authority for those propositions.
We find that the trial court properly taxed the defendants for expert witness fees under La.C.C.P. art. 1920, which provides that costs should generally be paid by the parties cast in judgment, but also gives a trial court discretion to tax costs against any parties "as it may consider equitable." LSA-R.S. 13:3666, relative to compensation of expert witnesses, also provides, in subsection B, that the fees for expert witnesses "are to be taxed as costs to be paid by the party cast in judgment." Thus, the trial judge properly taxed the defendants, who were cast in judgment, for expert witness fees.
For the above and foregoing reasons, the trial court judgment casting the defendants in judgment for expert witness fees is affirmed.

E. Conclusion on Damage Issues

For the reasons detailed hereinabove, the trial court judgment is amended to award Nicholson & Loup $1,286,618.50 against the defendants, to delete the $240,000 award for economic losses, and to delete the $937,500 credit for use.

III. SOLIDARY LIABILITY
Case contests the trial court decision holding him solidarily liable with Eustis and Woodward, saying that the trial court improperly cast him and Woodward as two separate entities. Employers also appeals on the solidarity issue, making the following arguments: (1) that the trial court should have apportioned fault between the solidary obligors, and (2) that it should not be responsible for Case's liability as Case is not named in the surety agreement.

A. Liability of Woodward and Case as Separate Entities

Case[3] challenges the trial court judgment casting him and Woodward as separate solidary obligors for the plaintiff's damages. Through a somewhat confusing argument concerning the trial court's decision to cast Eustis Engineering Co. and Eustis Engineering Co., Inc. as only one solidary obligor, Case says that he and Woodward are entitled to equal treatment. Case cites no authority for this proposition.
Nevertheless, we find merit in Case's position, although for reasons different from those promoted by Case. As discussed previously, the contract between the plaintiff and Woodward makes Woodward liable for both the design and the construction of the supermarket in question. Moreover, the presence of Case's name in that contract, when read in context, places all responsibility for the plans and specifications on Case. As we have found no evidence of any construction defects, Woodward's liability obviously flows from design defects, which is the same source as Case's *398 liability. That being true, Case and Woodward are liable for the same negligent acts, while Eustis, the other solidary obligor, is liable for different negligent acts. Thus, the trial court should have held Eustis solidarily liable with Woodward/Case as a single entity.
Under the provisions of La.C.C. art. 2320, Case's liability is subsumed by Woodward under the doctrine of vicarious liability; Woodward's acceptance of that liability is apparent in its brief. However, that fact does not relieve Case of all personal liability for the damages suffered by the plaintiff. In any case involving employee/employer vicarious liability, the employer and the employee are solidarily liable with one another as a matter of law for the damages caused by the employee's negligence, although the liabilities are based on different sources. Narcise v. Illinois Central Gulf Railroad Co., 427 So.2d 1192, 1194 (La.1983). The employee's liability is based on his personal act or omission, while the employer's liability is based on his relationship to the negligent employee. Id. Thus, our decision casting Woodward and Case as a single entity does not affect the relationship between those two parties, or their respective responsibilities for paying the judgment.

B. Apportionment of Fault

The trial court entered judgment against Woodward, Case, and Eustis, finding them solidarily liable for plaintiff's damages, but failed to apportion fault between the solidary obligors. Employers contests this omission, saying determination of Eustis' contribution and/or indemnity responsibility to Woodward under Woodward's third-party demand depends on the apportionment of fault.
La.C.C. art. 2103[4] (now La.C.C. art. 1804), relative to liability of solidary obligors between themselves, provided, at the time the petition and the third party demand were filed in the instant case, in pertinent part, as follows:
When two or more debtors are liable in solido, whether the obligation arises from a contract, a quasi-contract, an offense, or a quasi-offense, the debt shall be divided between them. If the obligation arises from a contract or a quasi-contract, each debtor is liable for his virile portion. If the obligation arises from an offense or quasi-offense, it shall be divided in proportion to each debtor's fault.

The above article requires the trial court to apportion fault whenever the obligation is based in "offense or quasi-offense," in other words, when the obligation arises from a cause of action "ex delicto."
In our discussion in the section on commencement of interest, we characterized the cause of action in this case as "ex delicto," which means that the defendants' obligations arise from a quasi-offense. Essentially, this case is based on tortious breach of contract. Although the action is premised on a construction contract, the obligation contested here, the duty to perform the contract in a workmanlike manner, arises from the provisions of the civil code. Because the obligation is imposed by the civil code, rather than the contract itself, and because the defendants' liability is based on negligent conduct, the action is quasi-offensive. Thus, under the provisions of La.C.C. art. 2103, the trial court should have apportioned fault.
However, our reading of the record convinces us that Eustis and Woodward/Case were equally at fault in causing *399 plaintiff's damages. Thus, we amend the trial court judgment to apportion fault between the solidarily obligated defendants as follows: 50 percent to Eustis and 50 percent to Woodward/Case.

C. Employers' Responsibility for Case's Negligence

Employer contests the trial court judgment holding it "liable as surety for defendants Carl E. Woodward, Inc. and Larry Case, in the amount of $929,307," arguing that it has no liability for Case's negligence as Case was not named in the surety agreement.
We find no merit in Employers' arguments. As discussed previously, Employers' surety agreement guaranteed performance of Woodward's contract with Nicholson & Loup. The design responsibilities imposed on Case were a part of that contract. As Employers guaranteed all aspects of the project, the surety agreement covered Case's responsibilities. The trial court was not manifestly erroneous in holding Employers liable for Case's negligence. The judgment is affirmed on this issue.

D. Conclusion on Solidary Liability Issue

For the reasons detailed hereinabove, the trial court judgment is amended to make Woodward and Case a single entity for purposes of solidary liability and to apportion 50 percent of the liability to Eustis and 50 percent of the liability to Woodward/Case.

IV. SUMMARY OF DECISION
For the above and foregoing reasons, the trial court judgment is amended to award plaintiff, Nicholson & Loup, a total of $1,286,618.50 against Eustis and Woodward/Case as solidary obligors. The judgment is further amended to recognize that Woodward and Case are a single entity for solidary liability purposes and to apportion fault 50 percent to Eustis and 50 percent to Woodward/Case. The judgment is also amended to delete the award of $240,000 for economic losses, and to delete the $937,500 credit for use. In all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.
LOBRANO, J., dissents in part.
LOBRANO, Judge, dissenting in part.
I respectfully dissent from that portion of the majority decision which holds Case personally responsible for structural engineering defects.
The sole premise of liability in this case is that of defective structural engineering. In my opinion that was not Case's responsibility. LeGardeur and Case both testified unequivocally that Case was not involved in the building's foundation. In fact, LeGardeur testified that he believed his deceased brother, George, was almost certainly the structural engineer. The evidence preponderates that Case was not involved in this aspect of the project.
I would amend the judgment rendered by the majority to delete Case as a judgment debtor. Since the contractor Woodward is still liable for structural engineering defects, its responsibility along with that of Eustis' is still in solido, each being responsible for 50% (their virile share). Employer's as the surety, is responsible for the full extent of its bond obligation.
NOTES
[1] Woodward argues in brief that the trial court should have dismissed the construction issues prior to trial because Nicholson & Loup failed to respond to requests for admissions on that issue for almost a year. Since we find no evidence of construction defects in the record, we pretermit discussion of that issue.
[2] We recognize that plaintiff got eight years of "good" use out of the store since the evidence indicates that the problems did not become apparent until 1981. However, the evidence is also clear that Nicholson & Loup is the victimized party in this case and that the plaintiff experienced numerous difficulties caused by the condition of the floor during the last seven years it was open. The fact that the plaintiff was unable to prove conclusively that its economic losses were directly attributable to the problems with the floor does not automatically entitle the defendants to the benefit of a credit for use, especially in light of the absence of any legal authority for applying that credit.
[3] Case's brief also discusses the possibility that this court might find that the defendants are not solidarily liable for the plaintiff's damages and hold the defendants liable only for their virile shares, but does not argue that this would be appropriate. Moreover, Case admits that "where the combined fault results in a loss for which defendants would be liable for the whole, the defendants' liability may be solidary." In the instant case, each defendant's liability is such that he would be liable for the whole. See Town of Winnsboro v. Barnard & Burk, Inc., 294 So.2d 867 (La.App. 2d Cir.), writs denied 295 So.2d 445 (La.1974). The trial court properly held the defendants solidarily liable.
[4] Nicholson & Loup argue that La.C.C. art. 2103 does not apply to the instant case because the "events" giving rise to the suit occurred before the effective date of the article, citing language from Cajun Electric Power Cooperative, Inc. v. Owens-Corning Fiberglass Corp., 528 So.2d 716, 721 (La.App. 5th Cir.), writ denied 531 So.2d 475 (La.1988) that the amendment to the article which allows for apportionment "became effective August 1, 1980." However, the plaintiff's argument ignores the fact that the Cajun Electric case goes on to determine that the amendment provisions apply if the cause of action arise "when judicial demand was made" after the effective date. Id. at 723. In the instant case, both the plaintiff's petition and Woodward's third party demand against Eustis were filed after the effective date of the amendment. Thus, the amendment applies.