787 So.2d 1069 (2001)
CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, and Certain Institute of London Underwriters Subscribing to Certificate No. 5469
v.
SEA-LAR MANAGEMENT, INC., d/b/a Contract Lease Operators.
No. 2000-CA-1512.
Court of Appeal of Louisiana, Fourth Circuit.
May 9, 2001.
*1071 J. Michael Grimley, Jr., James M. Tompkins, James R. Guidry, Galloway, Johnson, Tompkins, Burr & Smith, New Orleans, Counsel for Plaintiff/Appellee.
Ronald A. Johnson, Bettye A. Barrios, Johnson, Johnson, Barrios & Yacoubian, New Orleans, Counsel for Defendant/Appellant.
Robert P. McCleskey, Jr., Thomas Kent Morrison, Phelps Dunbar LLP, New Orleans, Counsel for Appellee.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY.
BYRNES, Chief Judge.
For the reasons hereinafter set forth, we find that the defendant-appellant Sea-Lar Management, Inc., D/B/A Contract Lease Operators breached an implied contractual duty to supply a qualified lease operator.
This action was instituted by insurers of Graham Energy, Ltd. to recover sums which they were required to pay on behalf of their insured arising out of an oil spill which occurred on February 2-3, 1992.
Certain Underwriters at Lloyds, London and Certain Institute of London Underwriters Subscribing to Certificate No. 5469 filed the original petition initiating this action on January 28, 1994, almost two years after the spill had occurred and the clean-up was completed. On October 31, 1994, Certain Underwriters at Lloyd's, London and Certain Institute of London Underwriters subscribing to Certificate No. 7863 filed a petition for intervention alleging that they were insurers of Graham concurrent with the original plaintiffs. The original plaintiffs and intervenors may *1072 be hereinafter referred to collectively as "plaintiffs" or "appellees" or "Lloyd's."
The original petition[1], which named as defendant Sea-Lar Management, Inc., d/b/a Contract Lease Operators, alleges that:
... Graham commenced remediation operations which were completed to the satisfaction of government officials on February 6, 1992.
Sea-Lar's original Answer raised the issue of prescription.[2]
By agreement of the parties and the trial court, this case was submitted to the trial court on briefs, depositions, exhibits and Cross Motions for Summary Judgment. We infer from the record that what the parties really intended was a trial on the merits with deposition testimony in lieu of that of live witnesses. As the parties and the trial court proceeded along these lines, we shall conduct our review as one involving a trial on the merits, rather than one involving a de novo review of a summary judgment.[3] In spite of the lack of a separate, discrete exception of prescription, all parties at all times, both below and in this Court, have treated the issue as being properly before the court. The trial judge adjudicated the issue in his written reasons for judgment, deciding that the ten-year prescriptive period for contracts applies, not the one-year prescriptive period for torts or delictual actions, and we consider the question to be properly before this Court.
The trial court denied Sea-Lar's Motion for Summary Judgment and granted Lloyd's Cross Motion for Summary Judgment. On January 5, 2000, the lower court ruled that the settling defendant, D.R. Lease, was responsible for 75% of the damages, with Sea-Lar responsible for the remaining 25% of the damages.[4]
Sea-Lar filed a Motion for New Trial and Lloyd's filed a Motion to Amend Judgment. The trial court entered a revised judgment, again finding the settling defendant, D.R. Lease, 75% at fault and defendant, Sea-Lar, 25% at fault. However, the *1073 lower court determined that it had improperly applied the $30,000.00 settlement with D.R. Lease as a dollar-for-dollar credit for damages. The damage award was amended increasing the amount that Sea-Lar was to pay.[5]
Sea-Lar filed a suspensive appeal. Lloyd's did not file an answer to the appeal.
There is really no dispute as to the underlying facts. In June of 1987 Sea-Lar Management, Inc. entered into a written Lease Operating Contract with Graham Energy, Ltd., for the operation of Graham's Well No. 2 in the Big Apple Field, Plaquemines, Louisiana. The contract required that:
Sea-Lar will provide a Lease Operator A to perform the following services:
1. Make two daily well equipment inspection [sic] in order to maintain production at a maximum efficient rate. Past experience indicates that the Lease operator will be on location for four (4) hours each day.
2. Perform preventative maintenance on production process equipment.
3. Gauge and load oil sales barge.
4. Prepare and transmit production, equipment maintenance, well test, and safety inspection reports as required by Graham.
5. Maintain good housekeeping.
Sea-Lar entered into a non-specific oral subcontract with D.R. Lease to perform the duties called for in its contract with Graham.
Subsequently, Graham requested David Rouse, president of D.R. Lease, to do work in connection with the removal of a sump pump and the installation of a water barge at Graham's Well No.2. This work was outside of the work subcontracted to D.R. Lease for Graham through Sea-Lar. In the process of doing this work, a safety system that would prevent an oil spill was disconnected and D.R. Lease did not reconnect it when the water barge was installed. It is not contested that D.R. Lease was negligent when it disconnected the safety system pursuant to its separate direct contract with Graham.
It is also not contested that Bobby Prout, a D.R. Lease employee, subsequently improperly tied the gas regulator back into the safety system, thereby disabling the safety system from performing properly, resulting in the oil spill that gives rise to this litigation.
Sea-Lar's first contention is that the one-year liberative prescriptive period for delictual actions should apply. The trial court held that the ten-year prescriptive period applicable to contracts applies:
The decision to pursue a tort or contract claim was clearly elective on [the] part of plaintiff and Underwriters. In Louisiana, it is well established that a party damaged by conduct arising out of contract may have a right to seek damages in tort and for breach of contract. State e[x] rel. Guste v. Chemical Applicators of Lafayette, Inc., 379 So.2d 1199, 1201 (La.App. 3rd Cir.1980). Further, it is well settled that the same acts or omissions may constitute a breach of both *1074 general duties and contractual duties and may give rise to both actions in tort and actions in contract. Ridge Oak Development, Inc. v. Murphy, 641 So.2d 586 (La.App. 4th Cir.1994) (citation omitted). The case at bar involves the negligent breach of a contract. Sea Lar contracted to provide lease operating services for Graham's well, which included minor repairs and maintenance of the production process equipment. Bobby Prout, the employee of D.R. Lease, admitted to improperly tying the gas regulator back into the safety system, which ultimately resulted in the system malfunction and the subsequent oil spill of February 2, 1992. Prout's actions, as well as Sea Lar's failure to supervise him and to assure that he was qualified to perform the lease operating duties are specific breaches of the Lease Operating Contract. In the instant case, the plaintiff and Underwriters chose to proceed under a breach of contract theory and are governed by the ten-year prescriptive period. [Emphasis added throughout.]
The trial court's written reasons go on to find that:
[A]n experienced lease operator/subcontractor should have known the difference between a gas line and a safety line. Sea Lar's failure to insure a knowledgeable and competent subcontractor was performing the daily duties in accordance with the Lease Operating Contract is a direct breach of this contract. [Emphasis added.]
Sea-Lar counters that its contractual duties did not include supervising Bobby Prout or making sure that he was "qualified to perform the lease operating duties." There is no specific mention in the contract of a duty to supervise or to "insure that a knowledgeable and competent sub-contractor was performing the daily duties." Sea-Lar contends that the silence of the Lease Operating Contract concerning the duty to supervise and the duty to hire a competent contractor makes the instant case factually analogous to that of Nicholson & Loup v. Carl E. Woodward, 596 So.2d 374 (La.App. 4 Cir.1992), because in Nicholson there was no specific reference in the contract to the duty found to have been violated. In Nicholson this court dealt with the question of whether judicial interest should commence on the date of demand as called for in delictual actions under LSA-R.S. 13:4203 or from the date it is due (reduced to judgment) under LSA-C.C. art.2000, which issue is legally analogous to the prescriptive issue now before this Court:
The jurisprudence is clear that determination of the commencement of interest depends on whether the suit is characterized as "ex delicto" or "ex contractu."
* * * * * *
Where cause of action arises from breach of a promise set forth in contract, the action is "ex contractu", [sic] but where it arises from a breach of duty growing out of contract, it is "ex delicto". [sic]
* * * * * *
The contract in question here contains no promises concerning the quality of the work, thus the cause of action in this case is not based on "breach of a promise set forth in contract" and it thus is not an obligation "ex contractu." The cause of action in this case is based on the duty to perform the construction in a workmanlike manner, which is imposed by La.C.C. arts. 2762 and 2769 and the jurisprudence interpreting those provisions. Since the cause of action is based on a "breach of duty growing out of contract,["] it is "ex delicto." *1075 [Emphasis added.] Under the provisions of LSA-R.S. 13:4203, the trial judge was required to impose interest from the date of judicial demand because the judgment was "ex delicto." LSA-R.S. 13:4203.
For the above and foregoing reasons, the trial court judgment imposing interest from the date of judicial demand is affirmed.
Nicholson, 596 So.2d at 396-397.
Similarly in Ridge Oak Development, Inc. v. Murphy, 94-0025 (La.App. 4 Cir. 6/30/94), 641 So.2d 586, this Court stated that:
Where a claim for breach of contract exists, plaintiff is entitled to plead it and assert the statute of limitations applicable to actions for breach of contract even where an action for conversion arising out of the breach would also lie. However, at trial, plaintiff has to prove that defendant breached some contractual duty above and beyond the general duty not to convert another's property in order for the statute of limitations applicable to actions for breach of contract to apply. [Emphasis original.] [641 So.2d at 589]
* * * * * *
The action on a contract flows from a breach of a special obligation, while an action in tort flows from the violation of a general duty. [Emphasis original.] [641 So.2d at 589]
* * * * * *
The classic distinction between damages "ex contractu" and damages "ex delicto" is that the former flows from the breach of a special obligation contractually assumed by the obligor, whereas the latter flows form the violation of a general duty owed to all persons. [641 So.2d at 591, citation omitted.]
However, this Court also explained in Ridge Oak Development that:
It is well settled that the same acts or omissions may constitute a breach of both general duties and contractual duties and may give rise to both actions in tort and actions in contract. [641 So.2d at 588, citation omitted.]
* * * * * *
[W]here a contract is breached by negligence, the party damaged may bring his suit either on breach of the contract or on the tort. [Emphasis original.] [641 So.2d at 589]
* * * * * *
The parties to a contract have the right to elevate a general duty to contractual status by including that duty as a provision of the contract. [641 So.2d at 590]
Sea-Lar argues that following our reasoning in Nicholson we should hold that the failure of the Lease Operating Contract to specifically refer to the duty to supervise and the duty to select a qualified operator means that those duties do not arise from a "breach of promise set forth in contract" (ex contractu), but from duties "growing out of contract" (ex delicto), meaning that the one-year prescriptive period for torts would apply, not the ten-year period for contracts. However, we do not read Nicholson to mean that all ex contractu duties contemplated by the parties need be specifically spelled out in minute detail in the contract. La. C.C. art.2054 provides for "implied" contractual obligations:
When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary *1076 for the contract to achieve its purpose. [Emphasis added.]
A contract includes, not only what the parties said, but also what is necessarily to be implied from what they said. Diaz Trucking Service v. Kramer's Transfer & Storage, 50 So.2d 71 (La.App. Orl.1951).
In fact, more contractual promises are probably implicit than explicit because of the impracticality, if not impossibility, of describing every variable the parties will encounter in the course of a contractual relationship. An implied contractual obligation arises just as much ex contractu as an explicit one. Moreover, it appears that this Court may not have taken La. C.C. art.2054 into account in reaching its decision in Nicholson. It is at least arguable that the result might have been different had this Court done so.
Therefore, if we determine that the Lease Operating Contract imposed on Sea-Lar the implied obligations of supervision and proper selection of a lease operator, creating what the reasoning in Nicholson would refer to as duties ex contractu, then the ten-year prescriptive period applies. Otherwise the one-year prescriptive period would apply to a breach of those duties. This is the same thing as saying that, if, pursuant to Ridge Oak Development, we determine that the contract called for these implied duties, then a breach thereof would be a breach of a "special duty" as well as a breach of a general duty, and the ten-year prescriptive period would apply. In other words an implied contractual duty is just as much a "special duty" as an explicit one.
Lloyd's brief explains that:
As is not uncommon in the oilfield, Sea-Lar in turn subcontracted, in an oral subcontract, with D.R. Lease to perform those five duties enumerated under the Lease Operating Contract. Graham was made aware of the subcontract arrangement and, in fact, shortly after the start of the lease operation began communicating directly with D.R. Lease, rather than with Sea-Lar, in regards to the daily well operations.
In the context of standard oil field practice as conceded by the defendants in the above quoted language from their brief, implicit in the language of the Lease Operating Contract where it calls for Sea-Lar to "provide a Lease Operator A," is the understanding that Sea-Lar would fulfill this obligation through a subcontractor. In other words, it is no accident that the contract did not refer to Sea-Lar as the Lease Operator. Instead of being the lease operator. Sea-Lar was merely required to "provide" one. There is no language in the contract, nor any testimony by the witnesses stating or implying any expectation of supervision by Sea-Lar nothing to support the trial court's finding of a duty to supervise. In fact, plaintiffs' own witnesses confirmed the fact that Graham dealt directly with D.R. Lease and its employees concerning activities at the well. Therefore, it was error for the trial court to conclude that Graham had an expectation that Sea-Lar would supervise its subcontractor.
However, we find that the trial court was correct in finding, in effect, that the contract contained an implied obligation to provide a qualified lease operator. If this were not the case, it would mean that Sea-Lar could hire anyone off the street regardless of qualifications. This would be absurd. Graham would have no need to contract with Sea-Lar to do that. Graham could just as easily hire any one off the street as could Sea-Lar, if qualifications were irrelevant. Therefore, we conclude that when Graham and Sea-Lar entered into the Lease Operating Contract, they *1077 must necessarily have contemplated the implicit obligation on the part of Sea-Lar to furnish a qualified lease operator. Accordingly, if Sea-Lar failed to provide a qualified lease operator, it would be a breach of an implied "special" duty under Ridge Oak Development or a "breach of [an implied] promise set forth in contract" under Nicholson, and the ten-year prescriptive period would apply.
Similarly, in Gagliano v. Namias, 479 So.2d 23, 25 (La.App. 4 Cir.1985), this Court held that:
A contract for work or service carries an implied obligation on the contractor to perform in a workmanlike manner in default of which he must respond in damages for the losses that may ensue.
See Goudeau v. Hill, 410 So.2d 338 (La. App. 4 Cir.1982).[6]
As stated previously, the trial court found that "an experienced lease operator/subcontractor should have known the difference between a gas line and a safety line." Sea-Lar does not contest this finding in either its original brief or in its reply brief, preferring instead to argue that it was not negligent because it did not know of Bobby Prout's lack of knowledge. Sea-Lar also argues that because Graham hired D.R. Lease directly to work on other Graham wells, Sea-Lar could not "be negligent in doing the same." The fact that Graham may have entered into a separate direct contract with D.R. Lease does not constitute a waiver or renunciation of any obligations due Graham by Sea-Lar under the Lease Operating Contract. Where Sea-Lar has the obligation to select/supply a qualified lease operator, Sea-Lar's lack of knowledge concerning its subcontractor's inexperience does not excuse its failure to fulfill its contractual obligation. Similarly, in Gagliano, supra, this Court stated that:
There must be some showing of want of skill, efficiency or knowledge or some lack of ordinary care in the performance of the work or in the selection of suitable equipment or materials. [Citation omitted.]
Gagliano, 479 So.2d at 25.
Following this reasoning in Gagliano, Sea-Lar's failure to select a qualified lease operator is just as much a breach of contract as the poor "selection of suitable equipment or materials" referred to by this Court in Gagliano, and want of knowledge is not an excuse.
Defective performance is just as much a breach of contract as is nonperformance. LSA-C.C. art.1904. Moreover, as this is a contractual obligation owed by Sea-Lar to its obligee, Graham, cases dealing with the immunity of the principal from the tortious acts of independent contractors and subcontractors are inapposite.
We find that Sea-Lar had an implicit contractual duty to hire a qualified lease operator. Conceding to the trial court the deference due its findings of fact, we find no error in the trial court's finding that D.R. Lease through its employee was not a qualified lease operator; and we find that this constituted a breach of Sea-Lar's contractual obligation to Graham and that Sea-Lar is liable for the consequences of this breach.
However, Sea-Lar contends that even if it is liable, it was released from that liability when Graham released D.R. Lease, thereby prejudicing Sea-Lar's right of contribution or indemnity against D.R. Lease and David Rouse. At issue is a *1078 "Receipt, Release and Indemnity Agreement" whereby both Lloyd's groups released D.R. Lease Operating Company, Inc., David Rouse, and United National Insurance Company for all acts and omissions "in any way related to the oil spill which occurred on or about February 2, 1990 on State Lease No. 192, Well No.2," which reads in pertinent part as follows:
This release includes, but is not limited to, any and all claims, demands, actions and causes of action for property damage, physical damages, compensation, loss of earnings, loss of profits or rents, damages to oyster beds, payments made in settlement ... or any other economic loss, whether at law, in equity, contract, quasi-contract, or otherwise, as well as pursuant to applicable state and/or federal statutes, including, but not limited to, the Louisiana Civil Code, Articles 667 et seq., Article 2315, 2315.3 et seq., and/or any other Louisiana law including but not limited to all Codal Articles or statutes giving rise to a cause of action ... on account of, or in any way growing out of the above mentioned oil spill or which have been or could have been asserted in the matter entitled "Certain Underwriters at Lloyd's London, and Certain Institute of London Underwriters subscribing to Certificate No. 5469 v. Sea-Lar Management, Inc. d/b/a Contract Lease Operators," bearing civil action n. 94-1566, on the docket of the Civil District Court, for the parish of Orleans, State of Louisiana. [Emphasis added.]
The trial judge in his very comprehensive written reasons for judgment stated that:
The court finds that defendant Sea Lar's arguments are circuitous, and at best, raise issues not before this court. Sea Lar is trying to assert a right that has not vested and the court declines to address this issues. The obligations of Sea Lar were not extinguished by the release of D.R. Lease because that release related only to the separate liability of D.R. Lease arising out of its oral contract with Graham to overhaul the waste water system. [Emphasis added.]
We find no limitation in the language of the release consistent with the immediately preceding highlighted language from the trial judge's reasons for judgment. The plaintiff and Lloyd's argue, consistent with the finding of the trial court, that the release was not intended to apply to their claim as it relates to the negligence of Bobby Prout, but we find no evidence in the record that could justify any deviation from the unequivocal and unrestricted nature of the contract. Argument of counsel and briefs, no matter how artful, are not evidence. Attardo v. Brocato, 96-1170 (La.App. 4 Cir. 2/5/97); 688 So.2d 1296. Sea-Lar argues that extrinsic evidence is inadmissible to explain or contradict the terms of the written release (Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741), but in this case there is no evidence, extrinsic or otherwise, as we have already noted, that would limit the clear language granting a total release from everything asserted in, or which could have been asserted in, this litigation.
Although the trial judge in his reasons for judgment makes no mention of the reservation of rights by Lloyd's against Sea-Lar, Lloyd's contends that had the release been intended to encompass D.R. Lease's actions through Bobby Prout pursuant to its subcontract with Sea-Lar, it would have been pointless to include the reservation of rights against Sea-Lar in the release. When faced with an analogous situation in Williams v. Marionneaux, *1079 124 So.2d 919, 240 La. 713 (1960)[7], the Supreme Court ruled otherwise. Therefore, we do not agree with Lloyd's argument that the reservation of rights clause limited the effect of the release to D.R. Lease's negligence in its performance of its direct contract with Graham and did not release D.R. Lease for any negligence in its performance of its subcontract with Sea-Lar. The release was all encompassing.
However, Sea-Lar is only prejudiced to the extent that the release may have prejudiced its ability to recover from D.R. Lease any amounts which Sea-Lar might be forced to pay in excess of its virile share of liability to plaintiffs. LSA-C.C. art. 1803 and 1804. In this case the trial court condemned Sea-Lar to pay only 25% of the total liability based on Sea-Lar's separate breach of its contractual duty to provide a qualified lease operator. The judgment does not hold that Sea-Lar is solidarily liable with D.R. Lease and it exposes Sea-Lar to no liability in excess of its virile share which the trial court determined was 25%. Therefore, although we do not agree with the trial court's finding that the release was not intended to cover the negligence of Bobby Prout, we find that the release is irrelevant because the trial court judgment does not require Sea-Lar to pay any more than its virile share.
Furthermore, the release does not and legally could not release D.R. Lease and its president, David Rouse, from any contractual obligation that those parties might have to indemnify Sea-Lar, as distinguished from a right of contribution from solidarily liable joint tort feasors. The trial court was correct in stating that Sea-Lar's right of indemnification was not before it and it is not part of this appeal. Sea-Lar's right to indemnification, if any, has yet to be determined. Therefore, we conclude that the Release did not prejudice Sea-Lar's rights and does not furnish Sea-Lar with a defense to this action. Sea-Lar makes no showing that a 25% allocation of liability to it is excessive, assuming that it can be held liable for its failure to provide a qualified lease operator. As we have found that Sea-Lar breached its contractual obligation to furnish a qualified lease operator, we have no basis for reducing the award against Sea-Lar, and as Lloyd's did not answer the appeal, we have no basis for increasing the award in favor of Lloyd's.
For the foregoing reasons the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Coastal Production, L.L.C. and David Rouse were later named as additional defendants in Lloyd's First Supplemental and Amending Petition.
[2] Referred to in the Answer as "the applicable statute of limitations." Subsequent Answers referred to "prescription" as well as the statute of limitations.
[3] For example, it is unusual to allocate fault pursuant to a summary judgment. However, neither party has raised a procedural objection to the employment of the summary judgment procedure. From this we infer that when the parties say that the matter was submitted "on briefs, depositions, exhibits and Cross Motions for Summary Judgment," what they really mean is that the parties agreed to a trial on the merits, but substituted deposition testimony for that of live witnesses. This inference is reinforced by the fact that neither party suggests that this Court should conduct a de novo review of the record. Moreover, the appellant. Sea-Lar, in its reply brief does not challenge the appellees' assertion that the manifest error standard of review is appropriate in this case. In short, none of the parties raise any issues that would be relevant if this were to be treated as the review of a summary judgment, e.g., no one argues about the existence of any genuine issues of material fact.
[4] To Plaintiff, damages in the amount of FORTY THREE THOUSAND AND SIX HUNDRED AND FORTY SEVEN 68/100 (43,647.68) DOLLARS from settling defendant D.R. Lease and FOURTEEN THOUSAND AND FIVE HUNDRED AND FORTY NINE 23/100 ($14,549.23) DOLLARS from defendant Sea Lar...; and to Underwriters, damages in the amount of FORTY SEVEN THOUSAND AND SEVENTY THREE 62/100 ($47,073.62) DOLLARS from settling defendant D.R. Lease and from defendant Sea Lar, damages in the amount of FIFTEEN THOUSAND AND SIX HUNDRED AND NINETY ONE 21/100 ($15,691.21) DOLLARS...
[5] To Plaintiff, damages in the amount of FIFTY-FOUR THOUSAND AND EIGHT HUNDRED AND NINETY-SEVEN 68/100 ($54,897.68) DOLLARS from settling defendant D.R. Lease and EIGHTEEN THOUSAND AND TWO HUNDRED AND NINETY-NINE 23/100 ($18,299.23) DOLLARS from defendant Sea Lar ...; and to Underwriters, damages in the amount of FIFTY-EIGHT THOUSAND AND THREE HUNDRED AND TWENTY-THREE 62/100 ($58,323.62) DOLLARS from settling defendant D.R. Lease and from defendant Sea Lar, damages in the amount of NINETEEN THOUSAND AND FOUR HUNDRED AND FORTY-ONE 21/100 ($19,441.21) DOLLARS ...
[6] Gagliano and Goudeau are based on old LSA-C.C. art.1930 and 1931 which were replaced in 1984 by LSA-C.C. art.1994. However, the "Revision Comment" to LSA-C.C. art.1994 explains that while it is new, "It does not change the law, however."
[7] Overruled on other grounds by Sampay v. Morton Salt Co., 395 So.2d 326 (La.1981), a much later, unrelated case.