hTERRI F. LOVE, Judge.
The plaintiff, Professional Divers of New Orleans, Inc. (“PDNO”), seeks review of a judgment in which the trial court granted the defendant, Helis Company, L.L.C. (“Helis”) a set off for the cost of remediat-ing PDNO’s allegedly defective performance of contract work. For reasons assigned below, we affirm the trial court’s ruling.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 1998, Helis contracted with PDNO to bury 20,280 feet of flow lines in addition to performing other related general underwater diving services. The flow lines were to be buried at the requisite depth of three feet below the mud line. The two parties agreed that the divers would be paid for all services rendered according to a day rate. Upon receiving work invoices, which indicated that the flow lines had been buried at the required depth, Helis conducted a survey of the area to insure the work had been done properly. The survey revealed that none of the flow lines were buried at the required depth. Helis maintains that, upon finding the defect in workmanship, it contacted PDNO to request remediation of the flow pines. Helis argues that PDNO refused to remediate the defective performance. Helis withheld payment of the work invoices submitted by PDNO. PDNO filed this suit seeking payment of the total amount of the work invoices based on the day rate in the amount of $140,480.95. Helis filed a recon-ventional demand in the amount of $77,028.00, which was the cost of hiring of another company to perform remediation services. The trial court awarded PDNO $65,480.95, which was the approximate difference between the total amount of day rate invoices submitted for payment by PDNO and Helis’s cost to remediate PDNO’s defective workmanship.

*247
ASSIGNMENT OF ERROR

PDNO contends that the trial judge erred in not awarding $140,480.95, which was the total amount of work performed by its divers based on the day rate. Specifically, PDNO alleges that the trial court erred when it rendered a judgment in the total sum of $65,480.95, which is the approximate difference between the $140,480.95 total listed on the work invoices and $77,028.00 that Helis paid for another company to re-bury the flow lines at the three-foot depth level.
The role of the appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact, and the adequacy of the award should be determined by facts or circumstances particular to the case under consideration. Youn v. Maritime Overseas Corp., et al, p. 4 (La.1993), 623 So.2d 1257, 1260.
This Court in Certain Underwriters at Lloyd’s, London v. Sea Lar Management, Inc., 2000-1512 (La.App. 4 Cir.5/9/01), 787 So.2d 1069, based its holding on La.C.C. arts. 2762 and 2769, because the appellant’s cause of action |shinged upon the contractor’s duty to perform construction in a workmanlike manner. La. C.C. art. 2762 governs the workmanship of stone, brick, or wooden buildings, and therefore is inapplicable to the facts of this case. La. C.C. art. 2769 governs the contractor’s liability for non-compliance with contract and it provides:
If an undertaker fails to do the work he had contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.
In the Certain Underwriters case (citing Gagliano v. Narnias, 479 So.2d 23, 25 (La. App. 4 Cir.1985)), this Court held that:
A contract for work or service carries an implied obligation on the contractor to perform in a workmanlike manner in default of which he must respond in damages for the losses that may ensue.
Certain Underwriters, 787 So.2d at 1077.
This Court stated further that “Defective performance is just as much a breach of contract as is nonperformance. La. C.C. art.1904.” Id.
In the instant case, the trial court stated the following in its written reasons:
The real explanation for this litigation is offered by Tomlinson during his cross-examination. Shortly after this job was finished he sold his company and, as he explained to Helis, “It[’]s not my problem.”
As discussed, only the divers were in the water. They were instructed to bury the line three feet and both divers who offered testimony at this trial were clear that they knew they were supposed to do so and did, indeed, attempt to do so. No reasonable explanation is offered for their failure to complete their job as required. Professional Divers seeks compensation for work not done as required. Thus, judgment is granted in this matter in favor of Professional Divers in a sum representing the difference in what they invoiced for the duration of this work and what Helis had to pay to get the job completed properly.
|4We agree. The record reveals that PDNO failed to bury the flow lines according to known industry standards. PDNO’s divers testified that they knew the flow lines were to be buried at three *248 feet below the mud line. Yet, PDNO submitted invoices stating that the work was completed. However, the work could not have been completed, because the survey revealed that PDNO’s divers failed to bury the flow lines in accordance with industry standards. PDNO’s failure to perform in a workmanlike manner constituted a defective performance, which effectively breached the Master Service Agreement.
PDNO alleges that it never claimed to be finished with the work. PDNO asserts that the Master Service Agreement between the parties provides payment of services rendered on a day rate pay scale for actual work done, not based on completion of the work. Contrary to PDNO’s contention, we find, as did the trial court, that the lynehpin of this case is the failure of PDNO to perform the work in a workmanlike manner consistent with good oilfield standards. It is not whether Helis should have paid PDNO the day rate for actual work done. The Master Service Agreement contains provisions, which govern in this type of situation.
The master service agreement provided the following language:
“Contractor warrants that all of the Work will be performed in a good and workmanlike manner consistent with good oilfield standards, that all of its employees will be competent and adequately trained to perform the Work competently and safely and that Contractor will provide to Company, upon request, any documentation requested by Company concerning contractor’s training and/or safety programs or history, and any other documentation requested by Company as set forth in Exhibit “C” or in order to comply with any applicable reporting requirements.”
With regards to payment of services rendered by PDNO, the Master Service Agreement provides, in pertinent part:
| BWork, §1.3
This Agreement, or any particular Work Request, may be canceled by Company at any time upon notice to Contractor and by the payment to Contractor for the Work theretofore properly completed but never in excess of the full compensation for the completed Work.

Payment, §8.1

Contractor shall invoice Company at Company’s post office address prior to the end of each calendar month for all due for the preceding month. Company, subject to Section 8.2 below, shall remit payment as to such invoice within thirty (8) days after receipt thereof; provided however, that payment by Company of any invoice shall not constitute a waiver of Company’s right subsequently to question or contest the amount or correctness of said invoice and to seek reimbursement. In the event of any dispute, Company may withhold payment of the disputed amount or Company may pay the disputed amount without waiver of any of its rights, including the right to seek reimbursement. Emphasis added.

§ 8.2

Company may withhold at any time such amounts as may be necessary to protect Company from loss on account of defective or deficient work, liens, or potential liens, or damage or loss to Company for which Contractor is or may be liable and on account of potential claims by Company or claims by Company for indemnity from Contractor under this Agreement.
The Master Service Agreement also provides for termination of the contract in the event of a breach of the terms of the agreement in the following manner:

*249
§ 20

In the event of the failure of Contractor properly to perform or provide the work contemplated hereunder, or Contractor’s breach of any of the obligations set forth in this Agreement, Contractor shall be considered in default and Company may immediately terminate this Agreement or any particular Work Request. Otherwise, Company may, in its sole discretion, terminate this Agreement, or any particular Work Request, at any time, with ten (10) days written notice, (emphasis added)
| (¡Under the terms of the Master Service Agreement between PDNO and Helis, PDNO was responsible for the burial of flow lines three feet below the mud line in addition to furnishing general diving services along with providing the equipment and personnel required to perform these services. Helis supervised the work and paid for the work done provided that the work conformed to industry standards.
According to § 1.3 of the provision entitled “Work”, PDNO is entitled to payment for work properly completed if the agreement is canceled. However, PDNO’s argument that Helis should have paid the day rate for work actually done is without merit, because the work done was not properly completed in accordance with good oilfield standards. The agreement also explicitly states that Helis may withhold payment for services rendered by PDNO in the event of a dispute or Helis could pay the disputed amount without waiver of any of its rights. Helis chose to withhold payment of the disputed amount. In this particular case, the dispute concerned PDNO seeking payment for work that was not properly performed at the required depth. The Master Service Agreement further specifies that Helis is entitled to immediately terminate the contract based on the defective performance. The survey revealed that the flow lines were not buried at the requisite depth level, which meant that the work was defective. Based on the clear, unambiguous language of the contract, Helis was reasonable when it withheld payment to PDNO for work not properly performed in accordance the law.
Accordingly, we find that the trial court did not err in ruling that PDNO did not perform the work in accordance with the master service agreement and industry standards. Furthermore, we are of the opinion that the court correctly awarded PDNO $65,480.95, which is the approximate difference between |7$140,480.95, the amount of full compensation sought by PDNO, and $77,028.00, which is the amount Helis paid to remediate PDNO’s defective performance.
AFFIRMED.
ARMSTRONG, C.J., concurs.
GORBATY, J., dissents, with reasons.